FS SERVICES, INC., a Delaware Corporation, as Successor by Merger to Illinois Farm Supply Company, an Illinois Corporation

v.

The UNITED STATES.

No. 409–64.

United States Court of Claims.

July 16, 1969.

Arthur E. Bryan, Jr., Chicago, Ill., attorney of record, for plaintiff. Charles E. Hussey II, Don S. Harnack and McDermott, Will & Emery, Chicago, Ill., of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant. Philip R. Miller and William Laverick, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on May 28, 1968. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by defendant. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with further proceedings to be held pursuant to Rule 47(c).

## OPINION OF COMMISSIONER

BENNETT, Chief Commissioner:

This is a suit to recover federal income tax and assessed interest paid for the fiscal year ended August 31, 1957. The suit arises as a result of defendant's disallowance of a deduction claimed for "[l]oss on sale of investment acquired to secure source of supply." Defendant ruled that said deduction constituted a capital loss rather than a deduction from ordinary income. For reasons appearing hereafter, the deduction claimed was proper and plaintiff taxpayer is entitled to judgment.

Plaintiff is successor by merger to Illinois Farm Supply Company (herein-

---

* The concurring opinion of NICHOLS, Judge, follows the opinion of the Trial Comissioner which has been adopted by the court.

after referred to as taxpayer or as Illinois), a statewide farm cooperative organization which served as a wholesaler to local member companies. These local cooperatives would purchase goods (principally petroleum products, feed and fertilizer) from taxpayer for resale to their members who were actively engaged in farming. A portion of taxpayer's earnings were set aside annually for distribution to its local cooperatives in the form of patronage dividends. The local cooperatives likewise distributed patronage dividends to the farmers who dealt with them.

Petroleum was taxpayer's most important single product, accounting for 60 percent of annual sales and 80 percent of taxpayer's employees throughout the relevant period. Taxpayer's market for petroleum products was greatly expanded during and immediately following World War II as many commercial distributors discontinued delivery to individual farms. Since taxpayer concentrated on this rural market, it and its local cooperatives became principal suppliers in the areas abandoned by commercial suppliers.

Taxpayer customarily obtained its petroleum products under annual contracts with large oil companies. These contracts, varying from 1 million to 60 or 70 million gallons each, were negotiated on a calendar-year basis, except that burner fuel contracts were normally negotiated in late summer to cover a September-to-September period.

In early 1947 taxpayer began to experience a shortage of petroleum products. By July of that year the situation was such that a rationing program was instituted whereby taxpayer limited the amount of gasoline it would supply to each individual local cooperative. A conservation program was also undertaken to encourage consumers to minimize their use of the scarce petroleum products. Throughout 1947 the shortage worsened, and by November taxpayer found itself 13 million gallons short of its minimum estimated requirements of burner fuels. These fuels were unavailable in the open market, as were range heat oil and kerosene. With its total needs projected at 190 million gallons, taxpayer had contracts for only about 100 million gallons of petroleum products by the winter of 1947–48.

The results of the shortage were especially severe during that winter. On occasion taxpayer found itself unable to supply its local cooperatives with fuel oil, and some farmers were consequently left with unheated homes. Under these circumstances taxpayer considered itself to be faced with possible destruction; if enough local cooperatives felt constrained to sever their relations with taxpayer permanently in order to seek supply elsewhere (three had done so), taxpayer's operation could be ruined. Nor would the problem automatically subside with the coming of warm weather, for farmers were equally dependent upon taxpayer for gasoline to be used in their planting and harvesting seasons.

In the face of these potentially destructive consequences, taxpayer was forced to seek solutions to its supply problems. The initial step was to authorize the temporary release of the local cooperatives from their exclusive purchase agreements, thus freeing them to purchase elsewhere if they could for the duration of the emergency. This measure was intended to develop a sense of participation in the solution of a common problem. Meanwhile, taxpayer occasionally purchased small quantities of petroleum products in the open market at premium prices. This, however, was not a satisfactory solution, for this premium could not be passed on to the consumer via an increase in the retail price.

Throughout its history taxpayer had traditionally opposed the acquisition of petroleum refining and production facilities. Although production was undertaken in other product areas, such as feed and fertilizer, the much larger investment required to purchase a refinery was considered prohibitive. On two occasions taxpayer had rejected opportunities to purchase refineries, the last occurring in January 1947. Nevertheless, the severity of the situation facing the tax-

payer during the shortage caused it to reconsider this no-refinery policy and to include possible acquisition of refining facilities among the alternatives considered.

Discussions and negotiations were held in the fall and winter months of 1947 regarding possible purchase of various refineries. Some were disregarded on grounds that they were unable to direct sufficient proportions of their output to the immediate use of taxpayer. Of the refineries considered, two were found to be suited to both the needs and the economic capacity of the taxpayer. These were Pana Refining Company (hereinafter referred to as Pana) of Pana, Illinois, and Premier Oil and Refining Company of Texas (hereinafter referred to as Premier of Texas).

After approximately 1 month of negotiations taxpayer purchased all the stock of Pana, together with the assets of a related concern (Louden Pipeline Company) for a price of $1,200,000. Pana was a small refinery located within taxpayer's marketing area, with an annual output of approximately 35 million gallons of finished products. (Pana is not directly involved in the present litigation.)

While the Pana negotiations were in progress, taxpayer was also engaged in discussions aimed at acquisition of other refining facilities. In this undertaking, taxpayer combined its efforts with those of two Minnesota cooperatives which were likewise adversely affected by the petroleum shortage. These other cooperatives were Midland Cooperative Wholesale, Inc. (hereinafter called Midland) and Farmers Union Central Exchange (hereinafter called Farmers Union). Together the three cooperatives were negotiating for the purchase of a group of refining properties (hereinafter referred to collectively as the Premier Properties). These properties consisted of the stock of Premier of Texas, the assets of Baird Refining Company (hereinafter called Baird), and the assets of Octane Refining Company (hereinafter called Octane).

The principal assets of these companies were five refineries, of which four were then operative, plus related assets (mainly pipeline systems). The refineries had an estimated annual output of 180 million gallons of the types of finished products useful to taxpayer's patrons. The taxpayer expected to receive roughly one-third of this amount if the purchase were consummated.

Upon investigation by officers of taxpayer and the other cooperatives, it became apparent that the Premier Properties were not an attractive investment by purely objective standards. The refineries were small and poorly located in relation to the market area served by the cooperatives. Furthermore, they were not positioned so as to use pipeline or water transport, but were completely dependent upon rail transportation, a less economical medium.

Even more significant from the viewpoint of a potential investor, the refineries were technologically obsolete. Their equipment was of a pre-World War II variety which was not able to produce a product of competitive quality under normal market conditions. While the shortage lasted, petroleum products were in such demand that even lower quality products were readily salable. However, when the supply began to balance this surge in demand it seemed likely that only higher quality products, i. e., products from more modern refineries, would be able to compete effectively.

Nevertheless, the cooperatives considered purchase of the Premier Properties to be an appropriate step under the circumstances, because of their value as a source of supply during a period when alternative sources were virtually nonexistent. These properties controlled large crude oil reserves and, so long as the shortage continued, they were capable of converting the crude into marketable finished products. At this time the prevailing opinion in the oil industry was that the shortage would continue for 2 to 3 more years. Thus, the cooperatives

had two alternatives: (1) purchase the Premier Properties to assure a source of supply, or (2) continue buying petroleum at premium prices and absorbing the resultant loss while seeking another solution. Since the shortage seemed certain to continue for several more years, they chose the former.

The purchase took place in July 1948. A new cooperative, Premier Petroleum Company (hereinafter referred to as Premier Petroleum), was formed to acquire and hold the Premier Properties. The three cooperatives subscribed for and purchased stock in Premier Petroleum as follows:

|  | Cash Paid | Percentage acquired |
| --- | --- | --- |
| Illinois Farm Supply Company (taxpayer) ..... | $1,980,036 | 36 |
| Farmers Union Central Exchange ............. | 2,200,040 | 40 |
| Midland Cooperative Wholesale, Inc. .......... | 1,320,024 | 24 |
| Total ............................ | 5,500,100 | 100 |

On or about July 26, 1948, Premier Petroleum borrowed $3,684,300 from the Central Bank for Cooperatives. Shortly thereafter the purchase was completed, with Premier Petroleum paying $7,500,-000 for all the stock of Premier of Texas and $1,292,274 for the related properties of Baird and Octane.

Upon the insistence of the sellers, the contract of sale contained provisions that (1) Premier of Texas would be operated as a going concern for at least 3 years, and (2) during this period the pipeline systems of Premier of Texas would remain in that corporation. These requirements were deemed necessary to resolve a tax problem of the sellers. Immediately after the sale, all of the operative refineries of Premier of Texas were distributed to Premier Petroleum as a dividend in kind. The loan from the Central Bank for Cooperatives was secured by a first mortgage on the transferred refineries and a pledge of all the common stock of Premier of Texas.

Not long thereafter the shortage unexpectedly began to ease. As early as August 1948 the taxpayer began to experience a slight oversupply of petroleum products. Meanwhile, gasoline was beginning to become available at nonpremium prices on the open market and it

soon became apparent that burner fuels were becoming more abundant. The winter of 1948–49 was much less severe than the one preceding, so that the demand for burner fuels was lower and prices thereon dropped accordingly. In the spring of 1949 gasoline prices similarly declined. At first these developments were considered temporary, but by the summer of 1949 the shortage period appeared to be over.

As anticipated, Premier Petroleum began to incur losses as soon as the shortage eased. These losses started by January 1949 and continued at an ever-increasing rate through the summer of that year. In July a financial consultant, Charles M. Horth, was retained to seek a means of stemming the losses. Both Mr. Horth and the president of Premier Petroleum were also asked to try to find a buyer for the properties, but neither was successful.

In November 1949 taxpayer's board of directors held a special meeting to consider Mr. Horth's recommendations and decide upon a plan of action. By this time the situation was critical, with Premier Petroleum on the verge of insolvency and far behind in payment of its obligations. After consideration of the various alternatives it was decided

to adopt Mr. Horth's proposals. In essence this involved a two-step plan: (1) improvement of Premier Petroleum's situation through changes in financial, production, and personnel policies, and (2) orderly disposition of the Premier holdings over a period of time. Implementation of the Horth program on point one soon improved Premier's cash position.

Taxpayer actively continued to seek a purchaser for its interest in Premier Petroleum. As expected, Midland and Farmers Union flatly rejected taxpayer's offer of sale. Mr. Horth resumed his efforts to locate a buyer and continued these efforts through 1950. Meanwhile, sales attempts were made by the president of Premier Petroleum and by officers of the three cooperatives, as well as an independent broker. None of these efforts met with success.

In 1951 Eugene M. Locke, a Dallas attorney with wide experience in oil operations, was retained to help arrange a sale. From that time until the eventual sale in 1956 he contacted numerous prospective purchasers, without success. It was standard practice in the oil industry to handle the sale of refining facilities in a confidential manner to avoid disruption of normal relations with customers, suppliers, and employees. For this reason, the Premier Properties were never advertised in industry publications nor was there any public solicitation of offers.

In the early 1950's certain assets of Premier Petroleum were individually disposed of, with some being sold for salvage. During this time some substantial improvements were made in certain of the Premier refineries through the installation of modern equipment. Such improvements were necessary to enable the company to produce gasoline of competitive quality and thus keep the company operational and, hopefully, salable.

In May 1956 the three cooperatives received their first offer of purchase. This offer was accepted and by contract dated June 30, 1956, Premier Petroleum sold its Premier of Texas stock to City Products Corporation. Taxpayer reported $712,708.62 on its income tax return for fiscal 1957 as an ordinary loss deduction resulting from the sale.

The District Director of Internal Revenue disallowed this deduction, maintaining that the loss sustained was capital in nature. The resulting deficiency, plus interest, was consequently assessed and the plaintiff paid these amounts. A timely refund claim was filed and, upon disallowance of this claim, the present suit followed.

The narrow issue presented here is characterization of taxpayer's loss as capital or ordinary. This, in turn, raises the question of whether the stock of Premier Petroleum constituted a capital asset in the hands of the taxpayer. The statutory definition of the term "capital asset," set forth in section 1221 of the Internal Revenue Code of 1954, 68A Stat. 321,[1] includes "property held by the taxpayer" with certain named exceptions. Since capital stock is normally thought of as "property," and since none of the exceptions of section 1221 are applicable to the taxpayer's situation, the literal wording of the statute would seem to encompass the Premier Petroleum stock.

But judicial interpretation has further restricted the scope of the capital asset concept by application of a flexible method of analysis which looks to the taxpayer's motivation for acquiring and holding the subject property. The leading case in this area is Corn Products

---

1. "Sec. 1221. Capital Asset Defined.
   "For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
   "(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
   "(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; * * *." 26 U.S.C. § 1221 (1964).

Ref. Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L. Ed. 29 (1955). The taxpayer there regularly bought and sold corn futures to guard against increases in the price of corn, a vital raw material in its business. The Court held that such transactions in futures, since they were undertaken to protect a part of the taxpayer's manufacturing costs, constituted an integral part of its manufacturing business. Since the taxpayer was thus dealing in its capacity as a manufacturer, and not as an investor or speculator, any income or loss realized was ordinary in nature. "Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss." 350 U.S. at 52, 76 S.Ct. at 24.

Other cases, decided both before and after *Corn Products,* have served to develop further this flexible interpretation of the term "capital asset." For example, in Commissioner of Internal Revenue v. Bagley & Sewall Co., 221 F.2d 944 (2d Cir. 1955), aff'g 20 T.C. 983 (1953), the taxpayer was required to post United States Government bonds as security for performance of a contract. Upon completion of the contract the bonds were returned to taxpayer, which thereupon sold them at a loss. It was held that, since the bonds were acquired solely to carry out the taxpayer's contractual obligation and since no investment was ever intended, the loss was deductible as a business expense rather than a capital loss.

Likewise, in Electrical Fittings Corp., 33 T.C. 1026 (1960), the taxpayer participated in the formation of a corporation to manufacture ductile iron, a raw material necessary to taxpayer's operation, when its regular source of supply became unreliable. Later, when taxpayer was able to purchase readily another type of iron which was better suited to its needs, it sold at a loss its stock in the ductile iron corporation. Upon the taxpayer's showing that it had no investment purpose in acquiring the stock, the Tax Court held that the stock was not a capital asset in the hands of the taxpayer and that the loss was thus a business loss fully deductible from ordinary income. *See also* Journal Co. v. United States, 195 F.Supp. 434 (E.D.Wis.1961); Mansfield Journal Co. v. Commissioner, 274 F.2d 284 (6th Cir. 1960); Byerlite Corp. v. Williams, 286 F.2d 285, 291 (6th Cir. 1960); Smith & Welton, Inc. v. United States, 164 F.Supp. 605 (E.D.Va.1958); Tulane Hardwood Lumber Co., 24 T.C. 1146 (1955); Western Wine & Liquor Co., 18 T.C. 1090 (1952); Charles A. Clark, 19 T.C. 48 (1952).

The same reasoning was applied by this court in Booth Newspapers, Inc. v. United States, 157 Ct.Cl. 886, 303 F.2d 916 (1962). The plaintiffs in that case were two newspaper publishing companies which joined forces to seek a solution to a newsprint shortage which developed in 1946 and 1947. Both plaintiffs had long been adverse to entering the manufacturing field, but upon the advice of consultants they bought all the stock of the Michigan Paper Company (hereinafter referred to as Michigan). Although Michigan then manufactured only fine quality writing paper and book paper, it was able to convert a part of its facilities to newsprint production while still maintaining its competitive position in its own product lines. Michigan supplied plaintiffs with substantial quantities of newsprint, at cost, from 1947 to early 1953, although for a period of up to 13 months no such deliveries were made. The newsprint shortage began to ease in 1953, although its threat did not end conclusively until 1956. In 1951 plaintiffs negotiated a long-term supply contract with an independent supplier, deliveries to begin in 1954. Having assured their supply in this manner, plaintiffs decided in July 1953 to sell their Michigan stock. A sale was finally arranged in February 1954 with plaintiffs sustaining considerable losses. The court found these to be ordinary losses, stating the applicable rule as follows:

> * * * if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his busi-

ness, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code. 157 Ct.Cl. at 896, 303 F.2d at 921.

In the present case, considering the evidence as a whole, it is found that taxpayer's acquisition of Premier Petroleum stock was based upon proper and valid business considerations rather than an intent to make a capital investment. The circumstances surrounding the acquisition convincingly demonstrate taxpayer's desperation in the face of possible destruction. With its customary sources of supply unable to meet its needs, taxpayer was unable to meet the needs of its local cooperatives and their patrons adequately. Stopgap measures were taken, as taxpayer instituted rationing and conservation programs and temporarily released its local cooperatives from their exclusive purchase agreements, but some more positive steps had to be taken. In such a situation taxpayer was forced to reconsider its traditional policy against purchase of refining facilities. With the shortage at a stage which proved to be its worst, a small refinery (Pana) was purchased and negotiations progressed toward purchase of the much larger Premier complex. Premier was acquired thereafter at a time when the shortage seemed certain to continue for at least another 2 years. At this time the purchasers were well aware that, absent the shortage, Premier was quite undesirable from their standpoint. Plaintiff's evidence shows clearly that the purchase was motivated by the temporary shortage.

Defendant contends that the taxpayer intended to make a permanent investment in a refinery complex, arguing that the integration of its oil operations was a logical step in taxpayer's overall growth pattern. As evidence of such an investment intent, defendant points to various extrinsic factors surrounding the Premier assets and the negotiations for their purchase. In particular, defendant stresses the crude oil reserves of Premier, which it views as the main factor motivating the purchase. Thus, says defendant, the principal purpose of taxpayer in acquiring Premier was to gain a long-range supply source and the means to convert it into finished products. This argument portrays the shortage as a mere coincidence unrelated to the purchase. To support this view, defendant emphasizes the acquisition of Pana and how the Premier crude oil reserves fit in with the needs of Pana. Such a contention is simply not justified by an examination of the entire record.

Defendant overlooks the taxpayer's long-standing policy against integration of its oil operations and the fact that Premier was admittedly an extremely poor vehicle for changing this policy. Defendant likewise fails to consider the extensive testimony and documentary evidence to the effect that the Premier purchase was justifiable only while the shortage continued. It is not realistic to suggest that taxpayer purchased a minority interest in Premier, a $9 million operation, in order to develop its holdings in Pana, which cost only $1¼ million. Similarly, the fact that taxpayer had formulated no plan for disposing of its Premier interest at the time of purchase does not necessarily exhibit an investment intent. This might be equally indicative of an emergency condition which dictated a hasty business decision. In short, the weight of the credible evidence presented here supports the conclusion that taxpayer's purchase of the Premier stock was made as a temporary expedient to insure an adequate supply of petroleum products.

Even if the purchase is found to be motivated by valid business considerations, with no investment intended initially, defendant contends that by the time of the sale in 1956 taxpayer did hold the Premier stock as an investment.

That is, defendant urges the court to hold that the original business purpose of the taxpayer had changed to an investment purpose at some time prior to disposition of the stock. Cited in support of this view are Gulftex Drug Co., Inc., 29 T.C. 118 (1957), aff'd, 261 F.2d 238 (5th Cir. 1958), and Missisquoi Corp., 37 T.C. 791 (1962). Defendant stresses the fact that the Premier stock was not sold until 1956, a full 7 years after the shortage period ended. Plaintiff counters with the argument that taxpayer made every reasonable effort to dispose of the securities and did so at its first opportunity. The issue is thus narrowed to a question of whether taxpayer held the Premier stock for an unreasonable length of time after the business necessity for doing so ceased to exist.

The decision of the Tax Court in *Gulftex Drug Co., supra,* is not really in point here. The taxpayer there, during a whiskey shortage, purchased stock in a distilling company in order to obtain certain whiskey purchase rights attaching to the stock. After purchasing the stock and exercising the rights (which were nonrenewable), the taxpayer continued to hold the stock for about 9 years before disposing of it. The court denied ordinary loss treatment, emphasizing the fact that the distillery stock was listed on the New York Stock Exchange and thus readily salable at all times. Such is not true of the present case, for the evidence amply demonstrates the low marketability of the Premier stock which was unlisted.

The *Missisquoi* decision, *supra,* is perhaps more helpful. The taxpayer there acquired debentures in 1950 to assure its supply of a raw material which was then scarce. By 1951 the demand for this material had declined, and by 1952 the taxpayer was using another type of material. Nevertheless, the debentures were retained until 1955, over 3 years after the necessity for holding them was past. The court discussed a number of factors, particularly those relating to the somewhat half-hearted efforts of the taxpayer to sell the debentures and the taxpayer's past history as an investor and then reached the following conclusion:

* * * While perhaps none of these factors, taken alone, would prove that Missisquoi was holding these debentures for investment purposes, they are evidence that they were being held for that purpose and they tend to negate petitioner's contention that they were being held only until a buyer could be found. * * *. 37 T.C. at 798.

Applying this same analysis to the facts of the present case, it seems that the taxpayer did take reasonable steps to dispose of its interest in Premier Petroleum when the necessity for holding it was over. Taking due notice of the need to proceed without fanfare, the taxpayer's efforts to negotiate a sale were sufficient to take this case out of the rule stated by the *Gulftex* and *Missisquoi* cases. Furthermore, the evidence amply bears out plaintiff's contention that its subsequent investments in Premier were designed solely to maintain and protect its marketability. While there are valid factors and arguments in favor of both parties, the evidence taken as a whole demonstrates that taxpayer stood ready to sell the Premier stock at all times after it became unnecessary to hold it, that it made every reasonable attempt to do so, and that only the low marketability of the securities caused the taxpayer to retain them for so long.

In light of the decided cases and the evidence presented, it is concluded that the stock of Premier Petroleum was acquired by taxpayer as an integral and necessary act in the conduct of its business and continued to be so held until its disposition. Accordingly, taxpayer was entitled to deduct its loss sustained thereon as a deduction from ordinary income for the fiscal year 1957, pursuant to the Internal Revenue Code of 1954, §§ 162(a), 165(a), 68A Stat. 45, 49. See Booth Newspapers, Inc. v. United States, *supra.*

NICHOLS, Judge, concurring:

I join in the decision of the court to adopt the commissioner's recommended decision Per Curiam. I do not understand defendant to deny—it admitted on oral argument—that if the commissioner's fact findings are correct, this court's decisions in Booth Newspapers, Inc. v. United States, 157 Ct.Cl. 886, 303 F.2d 916 (1962), is wholly controlling as to the law. Defendant's initial effort before us was to refute some of the findings, but under Rule 66 the presumption is that they are correct, and I do not see defendant's burden as sustained. Therefore, this case does not stand for any legal proposition except that courts should follow their own precedents when applicable.

Plaintiff, not satisfied with its fact advantage, it is true did argue for a broader view of the law, and defendant then took issue, but this debate is not, as I understand it, in any way reflected in our decision.