**TRANS–ATLANTIC COMPANY,**
Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE.**
No. 71–1913.

United States Court of Appeals, Third Circuit.

Argued Sept. 26, 1972.

Decided Nov. 21, 1972.

---

2. Letter dated March 28, 1969 from District Director to Joseph H. Trethewey, attorney for petitioners.

Lawrence J. Lee, Goodis, Greenfield, Henry, Shaiman & Levin, Philadelphia, Pa., for appellant.

William M. Brown, Dept. of Justice, Tax Div., Washington, D. C., for appellee.

Before STALEY, VAN DUSEN and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

The question in this case is whether payments made on various obligations of Trans-Atlantic were deductible as interest under 26 U.S.C. § 163(a) (1970) or were in reality disguised divi-

dends.[1] The Commissioner determined that they were dividends, and, therefore, assessed deficiencies of $7,849.50, $7,336.73, and $6,662.61 for the taxable years ending January 31, 1964, 1965, and 1966. The Tax Court affirmed, 29 CCH Tax Ct.Mem. 1414 (1970), and Trans-Atlantic appeals that decision.[2]

Before Trans-Atlantic's incorporation on February 1, 1956, the business of importing and jobbing hardware had been carried on as a partnership composed of Benjamin Greenstein, Norman Millman, and Carl Molk, all of whom are related. Greenstein had contributed to capital about $21,400, and loaned about $1,600.; Millman had contributed about $24,000, and loaned $500. Upon the incorporation, Greenstein and Millman retained equity positions; Molk became strictly a creditor; and Ralph Millman, a former creditor of the partnership, became a creditor of Trans-Atlantic. Also on February 1, 1956, Trans-Atlantic issued 10-year bonds bearing interest at 10%.[3] Trans-Atlantic's initial capital and liability structure was as follows:

|  | Class A Stock | Class B Stock | Bonds |
|---|---|---|---|
| Benjamin Greenstein | $3,750. (50 Shs.) | $11,250. (150 Shs.) | $ 8,000. |
| Norman Millman | 3,750. (50 Shs.) | 11,250. (150 Shs.) | 8,000. |
| Carl Molk | — | — | 15,000. |
| Ralph Millman | — | — | 9,000. |
|  | $7,500. | $22,500. | $40,000. |

The Class A and Class B stock were identical except that the latter was non-voting.[4] On February 1, 1966, $10,000. worth of the bonds were redeemed and the maturity date of the remaining was extended for one year; however, at the time of the Tax Court trial, these bonds were apparently still outstanding.

In March 1956, Greenstein divided his bonds equally between his 15-year old son and 17-year old daughter. In February 1959, Millman put his bonds in long-term trusts for his son, then 11, and for his daughter, then one.

During the years after the incorporation of Trans-Atlantic, Greenstein and Millman made advances, in addition to the bonds they already held, in the form of unsecured promissory notes, as follows:

### Benjamin Greenstein

| Taxable Year Ended January 31 | Advances | Repayments | Balance |
|---|---|---|---|
| 1957 | $ — | $ — | $ — |
| 1958 | — | — | 12,000. |
| 1959 | 12,000. | — | — |
| 1960 | 12,500. | — | 24,500. |
| 1961 | 13,500. | — | 38,000. |
| 1962 | 40,000. | — | 78,000. |
| 1963 | 5,000. | 12,500 | 70,500. |
| 1964 | 10,000. | 19,000. | 61,500. |
| 1965 | — | — | 61,500. |
| 1966 | 6,000. | 9,000. | 58,500. |

### Norman Millman

| Taxable Year Ended January 31 | Advances | Repayments | Balance |
|---|---|---|---|
| 1958 | $ 3,000. | $ — | $ 3,000. |
| 1959 | 10,000. | — | 13,000. |
| 1960 | 17,500. | 5,000. | 22,500. [sic] |
| 1961 | 30,000. | — | 55,500. |
| 1962 | — | — | 55,500. |
| 1963 | 5,000. | — | 60,500. |
| 1964 | — | — | 60,500. |
| 1965 | — | — | 60,500. |
| 1966 | 19,500. | 7,500. | 72,500. |

Most of these notes were payable on demand and bore interest at the rate of 10%; for the year ending in 1966, all

1. For a general discussion of this frequently litigated issue, see B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 4.04 (3d ed. 1971).

2. The burden of proving "the reality of the indebtedness" is on the taxpayer. See P. M. Finance Corp. v. Comm'r of Internal Revenue, 302 F.2d 786, 789 (3d Cir. 1962).

3. For clarity, these obligations will be referred to as bonds to distinguish them from subsequent advances, which will be referred to as notes.

4. The only relevant change in the capital structure occurred in January 1964, when Trans-Atlantic issued four additional shares of Class B stock for each one already held. In March of the same year, Greenstein transferred 100 Class B shares to Millman.

$6,000. of the Greenstein notes and $12,000. of the Millman notes were payable in five years and bore 6% interest. Greenstein made these advances for himself and for his children; Millman, for himself, his wife, and in trust for his still minor children. During each of the years ending in 1959 through 1966, various other relatives and associates of Greenstein and Millman held a total of about $50,000. of Trans-Atlantic's unsecured, 10% demand notes.

The history of Trans-Atlantic's relations with financial institutions is quite relevant. Prior to early 1959, Trans-Atlantic secured credit from Factors Corporation of America. At that time Trans-Atlantic switched to the First Pennsylvania Banking and Trust Company because Factors was charging 13.2% interest and proposed raising that to 15%. Trans-Atlantic used some of the funds advanced by Greenstein and Millman to pay off Factors. First Pennsylvania's Accounts Receivable Department would advance 80% of Trans-Atlantic's eligible accounts, charging 7.5% interest, up to a certain maximum line of credit; this maximum began at $100,000., increased to $125,000. in June 1960, and went up by another $10,000. in October 1962 and in May 1965. First Pennsylvania's International Banking Department gave Trans-Atlantic a separate line of credit, which was $50,000. as of September 1962; $90,000. as of March 1963; $110,000. as of January 1964; and $125,000. as of May 1965.

All the principal amounts of the Trans-Atlantic bonds were subordinated to First Pennsylvania loans. Similarly subordinated were $42,500. of Greenstein notes and $45,500. of Millman notes. The interest on the bonds and notes was not subordinated to the bank, and the principal amounts of these obligations were not subordinated to the claims of other creditors. The notes held by the relatives and associates, and apparently the remaining Greenstein and Millman notes, were not subordinated in any way.

By 1962 Trans-Atlantic's general financial condition was good. All interest on the various above-mentioned obligations had been and continued to be timely paid. As of January 31, 1966, the ratio of all Trans-Atlantic's liabilities and reserves to its actual net worth (as opposed to book net worth) was 1.36 to 1.0. Trans-Atlantic's record of earnings is as follows:

| Taxable Year Ended January 31 | Net Earnings (before taxes) |
|---|---|
| 1957 | $15,794.92 |
| 1958 | 19,022.49 |
| 1959 | 24,504.58 |
| 1960 | 24,954.15 |
| 1961 | 23,139.70 |
| 1962 | 49,108.01 |
| 1963 | 52,424.02 |
| 1964 | 53,461.53 |
| 1965 | 25,916.17 |
| 1966 | 45,389.43 |

The Commissioner challenges the interest deduction for the payments on the Greenstein and Millman bonds and notes for the above-mentioned fiscal years. The Commissioner does not challenge the deductions for the payments on the bonds held by Molk and Ralph Millman or for the payments on the notes held by the other, more distant relatives and associates of Greenstein and Millman.

The interest on notes disallowed for the tax years in question is shown as follows in paragraph 27 of the Stipulation:

| | Taxable Year End | | |
|---|---|---|---|
| | 1/31/64 | 1/31/65 | 1/31/66 |
| Benjamin Greenstein | $ 3,416.62 | $ 3,249.96 | $ 3,519.96 |
| Blanche Greenstein | 1,679.28 | 1,499.96 | 1,094.61 |
| Herman Greenstein | 1,316.82 | 1,400.12 | 1,083.87 |
| Norman Millman/ Trust Jeffrey | 1,000.00 | 1,683.34 | 625.04 |
| Norman Millman/ Trust Laurie Jayne | 5,050.00 | 4,366.62 | 5,964.92 |
| Total Note Interest Disallowed | $12,462.72 | $12,200.00 | $12,288.40 |

The law in this area of the tax field was carefully set forth in Fin Hay Realty Co. v. United States, 398 F.2d 694 (3d Cir. 1968). We enumerated 16 criteria for judging the true nature of an investment formally cast as a debt (see 398 F.2d at 696), but we concluded that

"[t]he various factors which have been identified in the cases are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Id.* at 697. To decide the case we relied on the following factors: the two shareholders each owned 50% of the stock and made equal additional contributions as "debt"; the corporation could not have repaid the demand notes in question for a number of years; it was impossible for the corporation otherwise to raise funds; and a prudent outside businessman would not have invested money in the unsecured demand notes at the rate of interest which they bore.

■ As to the bonds held by or for the children of Greenstein and Millman, we agree with the Tax Court that they did not constitute debt. True, similar bonds were also held by a retiring partner and by a former creditor of the partnership. *Cf.* Weaver Popcorn Co., 30 CCH Tax Ct. Mem. 1204 (1971). However, there is little evidence whether, when the bonds were issued, there was a reasonable prospect of repayment and whether Trans-Atlantic was thinly capitalized.[5] The subsequent history of the bonds, with only partial repayment, suggests that they were treated like equity. It is also relevant, given this history, that payment of their principal amounts was subordinated to the loans from First Pennsylvania. In short, Trans-Atlantic has failed to meet its burden of proving that the bonds were debt in substance as well as in form.

■ In regard to the notes in question, we do not disagree with the conclusion reached by the Tax Court even though the writer of this opinion has considerably more difficulty with that conclusion than with its decision on the deductibility of interest paid on the bonds.[6] The Tax Court seemed to rely primarily on the notes being subordinated and on their being held in roughly the same proportion as Greenstein's and Millman's stock interests.[7] 29 CCH Tax Ct.Mem. at 1421. This court has indeed relied on these factors in the past. General Alloy Casting Co. v. Commissioner of Internal Revenue, 345 F.2d 794 (3d Cir. 1965), aff'g per curiam 23 CCH Tax Ct.Mem. 887 (1964); Diamond Brothers Co. v. Commissioner of Internal Revenue, 322 F.2d 725 (3d Cir. 1963); P. M. Finance Corp. v. Commissioner of Internal Revenue, 302 F.2d 786 (3d Cir.

---

5. We note that the partnership books showed the capital contributed by the partners at almost $60,000.

6. Of the 16 criteria enumerated in *Fin Hay*, only three (2, 3 and 8) might indicate that the notes issued by the taxpayer corporation were not "true" debt. All the other criteria indicate that "the true nature of [the] investment" in these notes was debt (see *Fin Hay*, *supra* 398 F.2d at 696). The above-mentioned three criteria are:
"... (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; ... (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; ..."
As to 2 and 3, it is noted that several notes were purchased and held by the stockholders in fiduciary accounts for their minor children. See footnote 7 below.

7. The Tax Court also thought that the fact that the notes and bonds were owned by or in trust for minor children suggested that they were equity investments. The logic of this approach is difficult to understand. Obviously a trustee can make investments in stocks or in bonds or in both; the fiduciary relationship does not determine the character of the investment. If anything, it would appear that if a trustee holds instruments cast as debt, then they are debt, since the trustee would presumably be subject to surcharge if he failed to enforce the instruments according to their terms. *See* Restatement (2d) of Trusts, §§ 177, 205 (1959). However, there is a distinct possibility that, for example, a close family relationship between the trustee and the beneficiaries might make a suit for accounting unlikely.

1962). However, much of the importance of subordination depends on the presence of other elements. In *General Alloy*, both principal and interest of the note in question were subordinated, and the corporation which received the funds began corporate life with $50,000. of equity and $450,000. of debt. In *Diamond Brothers*, the recipient corporation was in very poor financial condition at the time of the advancements. In *P. M. Finance*, the Tax Court had found the corporation to be thinly capitalized; and while the court did not put weight on this, it held that the taxpayer failed to overcome the inferences it drew from subordination and proportionate ownership.

The writer of this opinion thinks that *Fin Hay* requires that more emphasis be given to the economic condition of the corporation at the time of the interest payments. Where the equity is substantial and where the business prospects are such that there is a reasonable prospect of repayment, subordination and proportionate ownership are certainly not conclusive. Jack Daniel Distillery v. United States, 379 F.2d 569, 580–585, 180 Ct.Cl. 308 (1967).

The Tax Court here found that "[i]t is true that petitioner was not thinly capitalized during the years at issue and it is also true that the notes and debentures could have been paid at any time on demand or maturity. . . ." 29 CCH Tax Ct.Mem. at 1421.[8] This finding is amply supported in the record: Trans-Atlantic's net earnings before taxes were very much on the increase, and its lines of credit with First Pennsylvania were steadily expanding. Moreover, Trans-Atlantic was able to raise money from outside sources, namely, the $50,000. from relatives and associates loaned on terms almost identical to those of the notes held by Greenstein and Millman.[9] Finally, given the 13.2% interest charged by Factors and the 7.5% charged by First Pennsylvania, and given the $50,000. in loans just referred to, it is difficult to infer that no prudent investor would have invested in Trans-Atlantic at 10%. Thus, the facts presented in this case are different from the situation this court faced in *Fin Hay*.

The decision of the Tax Court will be affirmed. Judges STALEY and MAX ROSENN concur in the result for the reasons stated by the Tax Court.

8. Although the character of an investment is usually resolved by the circumstances which existed at the time it was made, the time period crucial to section 163(a) is the taxable year when the interest is paid or accrued. *See* Cuyuna Realty Co. v. United States, 382 F.2d 298, 301, 180 Ct.Cl. 879 (1967); Bittker & Eustice, *supra* note 1, at 4–7. *But cf.* Fin Hay Realty Co. v. United States, 398 F.2d 694, 699 (3d Cir. 1968). Consequently, the period to focus upon consists of the years ending in 1964, 1965 and 1966. This approach seems especially justified since the notes are demand instruments and thus represent a continuing investment decision. In any event, it appears likely that, on the basis of the evidence regarding the year ending in 1958 and thereafter, one would probably reach the same result by looking to the years the debts were initiated as one does by looking to the taxable years in question.

9. All notes were unsecured, payable on demand, and bearing interest at 10%. The difference was that the principal amounts of Greenstein's and Millman's notes were subordinated to the bank loan. Nevertheless, it appears that a number of these notes were repaid. Although the issue was not raised in the briefs of counsel, the record indicates that only $88,000. of the Greenstein and Millman notes were so subordinated.