CHEMPLAST, INC., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5706–70. Filed July 30, 1973.

*Richard Kilcullen,* for the petitioner.
*Robert N. Ginsburg,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency of $35,122.93 in petitioner's Federal income tax for the fiscal year ending February 28, 1967. The sole issue for decision is whether petitioner's unrecovered advances to another corporation, in which it held stock, gave rise to a capital loss deduction, or whether these amounts are deductible from ordinary income as either an ordinary and necessary business expense under section 162,[1] an uncompensated loss under section 165, or a business bad debt under section 166.

### FINDINGS OF FACT

Chemplast, Inc. (hereinafter referred to as petitioner), was incorporated under the laws of the State of New Jersey on February 4, 1953. At the time it filed its petition with this Court, its principal place of business was located in Wayne, N.J. If filed its Federal income tax return for the fiscal year ending February 28, 1967, with the district director of internal revenue, Newark, N.J.

Petitioner's principal business activity since its incorporation has been the processing of polytetrafluoroethylene (hereinafter TFE), a fluorocarbon plastic. It purchases this material as a powdered resin from E. I. duPont de Nemours & Co. (hereinafter duPont) and other chemical companies and forms the material into a wide variety of basic shapes. It also has facilities for machining these shapes into special items and for coating products with this material or other plastics. The duPont trade name for TFE is Teflon.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue.

TFE is well known for its ability to resist heat and acid as well as its low electrical conductivity and low coefficient of friction. Because of these qualities, products made from or coated with TFE have a broad range of uses in the automotive, electrical, mechanical, and chemical manufacturing industries. These products are used in the equipment manufactured by those industries as well as in the machinery used to produce that equipment.

Petitioner does not have a proprietary interest in TFE; nor does it have any safeguards, contractual or otherwise, to protect its business from competitors.

In 1964, petitioner invented a fibrous, porous form of TFE which was given the name Zitex. On February 18, 1965, it filed an application for a patent on this invention which was later granted on a date not specified in the record. Zitex has been used for filtration and electrical insulation purposes. From the time of its invention through 1967, petitioner sold approximately $100,000 worth of Zitex. During the 5-year period ending in 1972, petitioner's sales of Zitex totaled between $750,000 and $1 million.

Among other possible applications, petitioner's officers thought Zitex could be used in fuel-cell electrodes. A fuel cell contains two plates with an electrolyte between the plates. Gas is fed to one plate in the fuel cell, and air is fed to the other. The cell produces electricity as long as both plates are being supplied these ingredients or reactants. An electrode separates the reactants from the electrolyte.

The electrode is essentially a piece of heavy wire screen, and bonded to the screen are particles of platinum and TFE. Platinum is the electrode's catalyst. The manner in which these particles are put together determines the electrode's effectiveness.

In 1964, American Cyanamid was the major supplier of fuel-cell electrodes. Petitioner's officers believed that, if a process could be developed to bond Zitex to the electrode, this would increase the effectiveness of the electrode and would allow petitioner to take over part of the fuel-cell electrode market.

In order to help develop the technology needed for Zitex to be used in fuel-cell electrodes, petitioner was interested in employing Peter M. Richman (hereinafter Richman). At that time, Richman was employed as a group leader in electrode development at Pratt-Whitney Aircraft. Although Richman was willing to leave that position, he would not accept petitioner's employment offer unless he could acquire an equity interest and some control over the electrode venture as part of the deal.

During the negotiations between Richman and petitioner, Richman initially indicated that he would enter petitioners' employ only if he were allowed an equity interest in petitioner. On its part, petitioner

was unwilling to give Richman an equity interest in its entire business since the business was quite profitable and dealt with many different products and procedures wholly unrelated to fuel-cell electrodes. The use of Zitex in fuel-cell electrodes still needed research, and petitioner did not wish to give Richman an equity interest in its entire business which he might continue to hold even if he failed to develop a commercially feasible fuel-cell electrode using Zitex.

The negotiations with Richman led to the creation of another New Jersey corporation, known as Chem-Cell Corp. (hereinafter Chem-Cell), as a means of allowing Richman to share in the benefits and profits, if any, which might be realized from his work on fuel-cell electrodes. Chem-Cell's authorized capitalization was 2,000 shares of class A stock with a par value of $1 per share, and 1,000 shares of class B stock with a par value of $1 per share. The stock carried the same rights in all respects, except that the class B stock had no voting rights. Simultaneously on April 26, 1965, an employment agreement between Chem-Cell and Richman, and a stock option agreement between petitioner, Chem-Cell, and Richman, were executed.

The employment agreement provided basically that Chem-Cell would employ Richman as its chief executive officer from April 26, 1965, to April 25, 1968,[2] at an annual salary of $15,000. Chem-Cell could discharge Richman for cause, and either party could terminate the employment relationship on 60 days' notice. Richman agreed that he would keep a record of all research and experiments which he carried on, and that if he discovered, invented, made, or developed anything while he was employed under the agreement which pertained or related to either Chem-Cell's or petitioner's business it would belong to Chem-Cell. There was also a provision in the agreement prohibiting him from doing any work with fuel-cell electrodes for a period of 1 year after he left Chem-Cell or was discharged for cause. This period was limited to 6 months if he was discharged without cause.

In section 1 of the stock option agreement, petitioner guaranteed Chem-Cell's salary payments to Richman. In the event Chem-Cell was liquidated or dissolved during the period of the employment agreement, petitioner agreed to employ Richman for the remainder of the period at a salary of $15,000 per year.

The stock ownership in Chem-Cell was covered by section 2 of the stock option agreement which, in pertinent part, provided that:

A. Chemplast will, at or before the execution of this agreement, purchase and pay for, at a price of $1.00 per share, 750 shares of the Class A capital stock of

---

[2] The parties have stipulated that "An employment agreement was entered into between Chem-Cell and Richman providing that Richman would be employed as the Chief Executive Officer of Chem-Cell for a term of five years." The discrepancy as to the length of the term is not explained.

Chem-Cell, and Richman will purchase and pay for, at a price of $1.00 per share, 250 shares of the Class A voting capital stock of Chem-Cell, which shares will represent respectively, 75% and 25% of the then authorized and outstanding Class A capital stock of Chem-Cell.

B. Richman will, at or before the execution of this Agreement, purchase and pay for, at a price of $1.00 per share, 72 shares of the Class B non-voting capital stock of Chem-Cell, convertible without further payment on and after April 25, 1970, into an equal number of Class A shares or, if there has been a split-up or other adjustment in the Class A or Class B stock since the date of this Agreement, into that number of Class A shares of which Richman would have then been the owner if, under this subparagraph 2B, he now purchased 72 shares of Class A stock (instead of 72 shares of Class B stock). Richman agrees that Chemplast may, on and after 1970, and at any time before April 26, 1970, purchase from Richman, at a price of $1.00 per share, all or part of his Class B shares as determined by the following schedule:

If the earnings of Chem-Cell from April 26, 1965, through April 25, 1970, are:

| Less than | But at least | Number of shares |
|---|---|---|
| $650,000 | $500,000 | 14 |
| 500,000 | 350,000 | 28 |
| 350,000 | 200,000 | 42 |
| 200,000 | 75,000 | 56 |
| 75,000 | 0 | 72 |

Chemplast agrees that any shares so purchased by it shall on Richman's request be immediately surrendered to the corporation by cancellation.

Other provisions of section 2 prohibited petitioner from using its shares to dilute Richman's ownership in Chem-Cell by causing the issuance of the authorized but unissued stock to specified individuals or entities unless full value in cash or property was received for the stock. Further, there was a provision that:

E. Chemplast may at any time advise Richman that it wishes to terminate its interest in the Chem-Cell Corporation in which event Richmond may acquire all of Chemplast's stock in Chem-Cell by delivering to Chemplast (i) a written guarantee of any monies then owed by Chem-Cell to Chemplast (guaranteeing payment over such period and in such installments as Richman, Chem-Cell, and Chemplast agree) and (ii) a written waiver of the [salary] guarantee set forth in paragraph 1 hereof.

Section 4 of this agreement provided that there would be seven members on Chem-Cell's board of directors. Both parties agreed to vote their shares so that five of those positions would be designated by petitioner and two by Richman. The initial board was to be composed of the five members of petitioner's board of directors plus Richman and one person designated by him.

Section 5 of the agreement dealt with petitioner's obligation to advance money to Chem-Cell. This was in addition to the amounts the parties agreed to pay for their Chem-Cell stock in section 2. Section 5 provided that:

Chemplast agrees that it will loan to Chem-Cell, as from time to time required for the operations of that corporation, up to $75,000, at interest not to exceed

6% per annum, said loan to be repaid only out of the profits of Chem-Cell and only as and when the condition of that corporation reasonably permits. Chemplast further agrees that it will not, without Richman's consent, authorize or permit the issuance of additional Chem-Cell stock for cash unless and until (i) Chemplast has advanced the full amount of $75,000, and (ii) the Board of Directors of Chem-Cell has thereafter determined that additional funds are reasonably required for Chem-Cell's operations.

The parties also agreed in section 8 that when Chem-Cell acquired "discoveries, inventions, and developments * * * which relate to" petitioner's business that Chem-Cell would offer them to petitioner. Chem-Cell further agreed that it would "negotiate in good faith with" petitioner concerning the transfers of such discoveries to petitioner.

As a result of these agreements, when Chem-Cell commenced operations petitioner acquired 690 shares of Chem-Cell's class A stock, and Richman acquired 200 of the class A shares and 72 of the class B shares. Both petitioner and Richman paid the par value for their shares. Throughout the period in controversy, no other Chem-Cell stock was issued.

Between April 1965 and December 31, 1966, petitioner advanced $75,000.69 to Chem-Cell. These advances took the form of cash transfers, the payment of bills incurred by Chem-Cell, and charges for services performed for Chem-Cell by petitioner's employees (such as laboratory assistants). The advances were carried on an open account on the books of both companies. No notes evidencing these advances were ever executed by Chem-Cell, and no interest was stated or accrued on the books of either company. Petitioner's $690 investment in Chem-Cell's stock was carried on its books in an account entitled "Investment In ChemCell [sic]."

Shortly after the beginning of 1967, various problems arose in connection with the Chem-Cell venture. As of December 31, 1966, Chem-Cell's assets were worth only $7,529.78 while it had current liabilities of $76,293.33. There had been only limited progress in developing the technology needed to use Zitex in fuel-cell electrodes. As a result of these and other factors, petitioner decided it would not put any additional money into the venture and would terminate its interest in Chem-Cell by liquidating that corporation.

Petitioner informed Richman it intended to liquidate Chem-Cell and that it would satisfy its guarantee of Richman's employment contract with Chem-Cell by transferring him to petitioner's payroll. Richman advised petitioner, however, that he did not wish to work for petitioner and preferred to endeavor to keep Chem-Cell alive.

On February 28, 1967, petitioner and Richman signed an agreement terminating petitioner's interest in Chem-Cell. Petitioner transferred its Chem-Cell stock to that corporation for cancellation. All of Chem-Cell's assets that remained after its creditors were paid were to be

transferred to petitioner. Petitioner transferred to Richman its claim for unrecovered advances to Chem-Cell. Richman released petitioner from its guarantee of his salary, and he agreed to change Chem-Cell's name. In addition, the parties settled the areas where each was to proceed and where, for a period of time, they would not compete.

After Chem-Cell's creditors were paid, its remaining assets were transferred to petitioner, and petitioner applied their value against the amounts it had advanced Chem-Cell. After these assets had been so applied, the unrecovered advances to Chem-Cell amounted to $73,172.78. Petitioner deducted this amount against its ordinary income on its fiscal 1967 return as extraordinary development expenses. It deducted the $690 loss on the Chem-Cell stock as a capital loss.

In the notice of deficiency, respondent determined that petitioner's advances to Chem-Cell were in reality contributions to Chem-Cell's capital and that the resulting loss should be treated as a capital loss. Respondent further determined that petitioner's unrecovered advances to Chem-Cell were not deductible against ordinary income either as a bad debt under section 166, an uncompensated loss under section 165, or an ordinary and necessary business expense under section 162.

OPINION

The issue is whether petitioner's unrecovered advances to Chem-Cell[3] are deductible against ordinary income or must be treated as a capital loss. Petitioner contends that it entered the Chem-Cell venture and retained its interest in that corporation until the beginning of 1967 as an integral part of its business operation and that its actions were not prompted by an investment purpose or motive. On this ground, petitioner asserts that it is entitled to deduct the amounts referred to above "as an ordinary business expense [under section 162 (a)[4]] or as an uncompensated ordinary loss [under section 165(a)[5]] in the year in which the stock was sold."[6]

---

[3] As mentioned in our Findings, petitioner deducted the $690 it originally paid for its Chem-Cell stock as a capital loss on its fiscal 1967 return. There was no allegation in the petition that this amount should have been deducted against petitioner's ordinary income, nor was there any attempt to amend the petition to include such an allegation. Our decision does not relate to the characterization of that deduction. *William Greenberg,* 25 T.C. 534, 537 (1955).

[4] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

[5] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

[6] Although petitioner argues that it is entitled to a deduction against ordinary income for these amounts—under either sec. 162(a) or sec. 165(a)—and that it is immaterial whether its advances to Chem-Cell were capital contributions or loans, as an alternative argument petitioner also maintains that its unrecovered advances are deductible as bad debts under sec. 166(a). In regard to the latter issue, petitioner has the burden of proving that its advances to Chem-Cell should be treated as valid debts for tax purposes.

Respondent's position is that petitioner entered the Chem-Cell venture with an investment purpose. On this theory, respondent maintains that petitioner's loss is a capital loss and that its deductibility for the fiscal year 1967 is governed by the limitations imposed by section 1211(a).[7]

Subject to certain exceptions described therein, section 1221 provides that "property held by * * * [a] taxpayer" is a "capital asset." Since stock or an equity investment in a corporation is property and since none of the exceptions in section 1221 is applicable to petitioner's interest in Chem-Cell, the literal wording of that section would appear to characterize petitioner's interest in that corporation as a capital asset. If this were the case, petitioner's loss in 1967 would be a capital loss, and petitioner would be denied a deduction against its ordinary income for the amounts which it lost in its dealings with Chem-Cell.

The above analysis is consistent with the wording of section 1221, but respondent acknowledges that the literal language of the section is not the only standard which may be used to characterize a loss resulting from advances of funds from one business to another. Indeed, respondent concedes that "there are circumstances in which the sale or other disposition of what is, nominally, a capital asset may result in ordinary income or loss."

A prime example of this principle is *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52 (1955), where the taxpayer, engaged in the manufacture of products from grain corn, bought and sold corn futures to protect itself against price fluctuations and realized a gain from those dealings. Even though the corn futures were not excluded from the capital assets category by the literal language of any Code provision, the Supreme Court denied capital gain treatment to the taxpayer's profit from trading in corn futures. The Court stated that "Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss." To extend the application of the capital

---

*Trans-Atlantic Co.* v. *Commissioner*, 469 F.2d 1189, 1193 (C.A. 3, 1972), affirming a Memorandum Opinion of this Court; *P. M. Finance Corp.* v. *Commissioner*, 302 F.2d 786, 789 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court. The record shows that the advances were made on an open account; there was no maturity date for the repayment of the advances; there was no specific rate of interest payable on the outstanding advances; repayments of the advances—as well as the payment of interest—were "to be repaid only out of the profits of Chem-Cell and only as and when the condition of that corporation reasonably permits"; no security was given for the advances; and the agreement to make the advances was entered into at Chem-Cell's inception. In addition, the record clearly shows that Chem-Cell was undercapitalized throughout the period of its existence. In view of these and other facts in the record, respondent was correct in treating petitioner's advances as contributions to Chem-Cell's capital. Cf. *Fin Hay Realty Co.* v. *United States*, 398 F.2d 694, 696 (C.A. 3, 1968).

[7] SEC. 1211. LIMITATION ON CAPITAL LOSSES.

(a) CORPORATIONS.—In the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges.

asset provisions to cover "transactions in property" which are "the normal source of business income," the Court concluded, would "defeat rather than further the purpose of Congress." (350 U.S. at 52.)

This principle has been applied in a variety of factual settings. In *Booth Newspapers, Inc.* v. *United States*, 157 Ct. Cl. 886, 303 F.2d 916 (1962), the taxpayer bought the stock of a papermill to assure a supply of newsprint at a time when there was a serious shortage of paper and, when an adequate supply became available, sold the stock at a loss. Upholding the taxpayer's claim to an ordinary loss on the stock sale, the court stated the applicable rule of law, distilled from numerous other decisions, as follows (157 Ct. Cl. at 896, 303 F.2d at 921) :

if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code.

Ordinary losses from transactions otherwise falling within the literal language of the capital loss provisions have been allowed in other cases where the taxpayer's objective was to obtain a reliable supply of raw materials at reasonable prices or in adequate quantities. See, e.g., *Electrical Fittings Corp.*, 33 T.C. 1026 (1960) ; *Tulane Hardwood Lumber Co.*, 24 T.C. 1146 (1955) ; *Western Wine & Liquor Co.*, 18 T.C. 1090 (1952) ; *FS Services, Inc.* v. *United States*, 188 Ct. Cl. 874, 413 F.2d 548 (1969) ; *Journal Co.* v. *United States*, 195 F.Supp. 434 (E.D.Wis. 1961).

The application of this principle is not limited to the source-of-supply situations. In *Schlumberger Technology Corp.* v. *United States*, 443 F.2d 1115 (C.A. 5, 1971), the *Corn Products* doctrine was applied to a set of facts analogous to those presently before us. That case dealt with the characterization of deductions for unrecovered loans made to two corporations (ASI and CSI) and the amount paid to acquire stock in one of the corporations (ASI). The court concluded that the activities of the two corporations were integrally related to the conduct of the taxpayer's business [8] and that the expenditures were prompted by a business rather than an investment motive. Particularly relevant to the instant case was the creation of a new corporation (ASI) as a means whereby the taxpayer could obtain the services of

---

[8] CSI was engaged primarily in the development, manufacture, and sale of analogue computers, and in analogue and digital computer research. The court found that the taxpayer's reason for lending money to this corporation was to obtain assistance in integrating computer analysis into its business of measuring physical phenomena, primarily in oil discovery and space exploration. Similarly, the court concluded that the taxpayer acquired the ASI stock and made loans to that corporation because it believed ASI's personnel could be instrumental in obtaining markets for its products and providing a valuable scientific research team for its secondary business activity.

former employees of Hughes Aircraft, who had needed business experience and contacts, but who refused to accept employment unless given stock options. In holding that the losses were ordinary and not capital ones, the court specifically rejected the Government's contention that the *Corn Products* doctrine and "The integrated business activities" test articulated in *Booth Newspapers, Inc.*, applied only where the "transactions are necessary as a 'temporary business expedient,' e.g., to acquire an inventory or protect a source of supply." (443 F.2d at 1120.)

Other applications of this principle can be found in *Steadman* v. *Commissioner*, 424 F.2d 1 (C.A. 6, 1970), affirming 50 T.C. 369 (1968), certiorari denied 400 U.S. 869 (1970) (advance of funds to a corporation by an attorney to protect his position as its secretary and general counsel) ; *Waterman, Largen & Co.* v. *United States*, 189 Ct.Cl. 364, 419 F.2d 845 (1969), certiorari denied 400 U.S. 869 (1970) (purchase of stock in a new corporation in order to become its exclusive sales agent) ; *John J. Grier Co.* v. *United States*, 328 F.2d 163 (C.A. 7, 1964) (purchase of stock in order to safeguard rights under a lease covering premises used for a restaurant business) ; *Commissioner* v. *Bagley & Sewall Co.*, 221 F.2d 944 (C.A. 2, 1955), affirming 20 T.C. 983 (1953) (loss on Government bonds acquired for deposit in escrow to discharge a contract obligation) ; and *Pittsburgh Reflector Co.*, T.C. Memo. 1968–75 (purchase of stock in Canadian subsidiary in order to increase business and save freight costs and duties).

Deciding whether a particular transaction fits within the integrated business activities exception to the capital asset provisions of the Code requires a careful examination of all the facts. Consideration must be given to the factual background of the transaction, the needs of the particular business during that period, and the intention of the taxpayer, both at the time the securities were acquired and at the time of their disposition. *Booth Newspapers, Inc.* v. *United States*, 157 Ct.Cl. at 896, 303 F.2d at 921; *Schlumberger Technology Corp.* v. *United States*, *supra* at 1121.

Respondent's answer in this case admits that petitioner's reason for forming Chem-Cell and advancing funds to that corporation was "In order to obtain" the services of Richman, a research scientist with special knowledge in the field of electrode development. As a condition to acceptance of employment, Richman demanded an arrangement that would give him an equity interest in the organization which would profit from his work. Petitioner organized, operated, and advanced funds to Chem-Cell, paid its bills, and made assignments of personnel to that corporation, when, as, and if needed, with the objective of developing petitioner's own business, not with a view to making a capital investment.

The steps taken by petitioner to develop a market for TFE and Zitex through research performed by Chem-Cell were an integral part of petitioner's business. Since its organization, petitioner has been engaged in processing TFE and selling derivative products. The business is extremely competitive. Petitioner has no proprietary interest in TFE, and other business organizations can buy and process TFE for the same purposes as petitioner uses it. This means that petitioner must continually devise new end uses for its products. Failure to do so would mean the loss of petitioner's competitive position.

While petitioner's invention of Zitex in 1964 provided an opportunity to expand its TFE sales, a great deal of research was needed to develop industrial uses for this new product. One such possibility was to use Zitex in fuel-cell electrodes, and Richman, an expert in this area, was regarded as the best prospect to direct this work. Though Richman was willing to accept employment for this purpose, he demanded an equity interest in the business which he developed. It was not practicable to arrange for him to acquire a stock interest in petitioner because petitioner, a highly successful corporation, dealt in many different products and with many procedures wholly unrelated to fuel-cell electrodes. For this reason, the arrangement described in our Findings, whereby Richman acquired a stock interest in Chem-Cell, was made.

The reason for the Chem-Cell arrangement was to develop a new use and, as that use was perfected, a new market for its recent invention, Zitex. This reason was dominant at the time the advances here in question were made and so remained until Chem-Cell was liquidated.

The record clearly shows that petitioner needed the services it anticipated Richman would provide and that Chem-Cell was organized so petitioner could get the benefit of those services. Likewise, it is clear that petitioner terminated its interest in that corporation when it became apparent that Chem-Cell could not develop a commercially feasible fuel-cell electrode. Petitioner contractually reserved the right to acquire from Chem-Cell any inventions, patents, or other discoveries usable in its business. Petitioner has shown that throughout this period, its actions were motivated [9] by the need for increasing its Zitex sales through exploitation of the development work to be done by Richman and employees assigned to Chem-Cell.

---

[9] Even though the original purpose for acquiring securities is business-related, it is still possible that events occurring prior to their disposition may cause them to be retained because of an investment motive. *Missisquoi Corp.*, 37 T.C. 791 (1962) ; *Gulftex Drug Co., Inc.*, 29 T.C. 118 (1957), affirmed per curiam 261 F.2d 238 (C.A. 5, 1958). When this occurs, the securities are a capital asset. But Chem-Cell failed, and the time never came when petitioner's continued ownership of its Chem-Cell stock was dictated by an investment motive.

When this goal was no longer attainable through Chem-Cell, petitioner's interest in that corporation was terminated, and petitioner's loss under section 165(a) was realized. Cf. *Electrical Fittings Corp.*, 33 T.C. 1026, 1032 (1960).

In light of the record as a whole, respondent's attempts to impute an investment motive to petitioner's actions are not convincing. His first argument is that there was no business need for the Chem-Cell arrangement since petitioner's "sales of Zitex have continued to grow in spite of the lack of success in the research conducted by Chem-Cell." Respondent's apparent suggestion that the term "business need" be interpreted so as to exclude the needs of businesses experiencing success ignores the fact that petitioner, notwithstanding other sales, still needed the work performed by Chem-Cell if it was to develop a market for Zitex in the manufacture of fuel-cell electrodes.

Respondent next argues that certain factors in the record, e.g., that the money was put at the risk of the subsidiary, that petitioner limited the amount it was willing to commit to the venture, and that the decision to terminate its interest in Chem-Cell was based on monetary considerations, show that petitioner was motivated by an investment rather than a business purpose. We do not agree. Indeed, we think these factors support petitioner's position. Petitioner made the cash transfers, paid Chem-Cell's bills, and assigned its laboratory and other personnel to Chem-Cell in much the same way it would have proceeded if Richman had become its employee and it had financed the fuel-cell electrode research directly. By proceeding in this manner, petitioner could maintain maximum control over Chem-Cell's expenditures and procedures. Petitioner's decisions and actions, when viewed in the light of other facts in the record, are consistent with the commonsense and cautious handling of an integrated business endeavor.

To give effect to the parties' settlement of another issue,

*Decision will be entered under Rule 50.*