B. T. FOOKS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent B. T. FOOKS and GULNARE FOOKS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
B. T. Fooks, Inc. v. Commissioner
Docket Nos. 6420-73, 6421-73.
United States Tax Court
T.C. Memo 1975-287; 1975 Tax Ct. Memo LEXIS 86; 34 T.C.M. (CCH) 1242; T.C.M. (RIA) 750287; September 16, 1975, Filed Jerry T. Light,H. T. Larzelere, Jr.,Lewis H. Mathis, and William H. Sutton, for the petitioners. Randolph A. Monsur, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND *87 OPINION SCOTT, Judge: Respondent determined deficiencies in Federal income taxes of B. T. Fooks, Inc. for its fiscal years ended October 31, 1967, and October 31, 1970, in the amounts of $973.36 and $87,072.51, respectively, and determined a deficiency in Federal income tax of B. T. Fooks and Gulnare Fooks for their calendar year 1970 in the amount of $221,138.22. Certain issues raised by the pleadings were conceded by each party on brief, leaving for our decision the following: (1) Whether petitioner B. T. Fooks, Inc. is entitled to a deduction for addition to its reserve for bad debt in the amount of $322,094.12 for its fiscal year ending October 31, 1970, or was the amount resulting in this claimed addition to reserve in fact amounts which were contributions to capital of a related corporation; and if so did these amounts constitute an ordinary or capital loss; and (2) Whether petitioner B. T. Fooks received a dividend from the corporation B. T. Fooks, Inc. when that corporation made no effort to collect from him personally notes totaling $78,095.47 which were owed to B. T. Fooks, Inc. by a related corporation. FINDINGS OF FACT Some of the facts have been stipulated *88 and are found accordingly. B. T. Fooks, Inc. is an Arkansas corporation incorporated on April 1, 1946. On the date of the filing of the petition in this case its principal office was located at Camden, Arkansas. Prior to October 31, 1970, the name of the corporation which is now B. T. Fooks, Inc. was Grapette Company, Inc. (hereinafter referred to as the Camden Company). The Camden Company filed its Federal corporate income tax return for its taxable year ending October 31, 1970, on January 18, 1971, with the Director, Internal Revenue Service Center, Austin, Texas. It timely filed its corporate income tax return for its fiscal year ended October 31, 1967, with the District Director of Internal Revenue at Little Rock, Arkansas. B. T. and Gulnare Fooks, husband and wife, resided in Camden, Arkansas, at the time of the filing of their petition in this case. They filed a joint Federal income tax return for the calendar year 1970 with the Director, Internal Revenue Service Center, Austin, Texas. From the time of its incorporation until the end of its fiscal year 1970 the Camden Company was in the business of licensing bottling companies to sell soft drink syrups, concentrates and *89 other products. Petitioners B. T. Fooks and Gulnare Fooks and their children, Robert Fooks and Frances Fooks Newhouse, owned the stock of the Camden Company equally at all times from the date of the incorporation of the company through the fiscal year of the company ending October 31, 1970. Neither Mrs. Fooks, Robert Fooks, nor Frances Fooks Newhouse participated in the operation of the Camden Company. During the years here in issue Mr. B. T. Fooks was chairman of the board of directors of the Camden Company and as such was chief executive officer of the company. The president of the Camden Company during these years was Mr. George A. Lewis and the vice president of the Camden Company in charge of franchise development was Mr. James E. Finley. The Grapette Bottling Company of Dallas, Inc. (hereinafter referred to as the Dallas Company even though its name was twice changed) was a corporation engaged in bottling soft drinks in the Dallas, Texas area. For several years prior to November 1, 1967, all the stock of the Dallas Company was owned by Mr. T. J. Rester. The Dallas Company was a customer of the Camden Company and distributed bottled drinks made from the Camden Company's concentrates *90 throughout the metropolitan Dallas area. On several occasions prior to November 1, 1967, the Camden Company had made loans to the Dallas Company or had guaranteed notes of the Dallas Company at various banks. On several occasions in the early part of 1967 Mr. Rester had stated to Mr. B. T. Fooks that he was sustaining losses in the operation of the Dallas Company and was considering ceasing operation. Mr. B. T. Fooks had three employees of the Camden Company make a study of the area served by and the operating procedures of the Dallas Company in order to assist Mr. Rester in introducing changes which would place the Dallas Company on a profitable operating basis. Under date of July 21, 1967, Mr. B. T. Fooks, on the letterhead of the Camden Company, addressed a letter to Mr. Rester summarizing the result of the survey of the Dallas area and the Dallas Company's operating procedures made by the three representatives of the Camden Company. The letter consisted of seven pages and was signed by Mr. B. T. Fooks as chairman of the Camden Company. The conclusion reached in this letter was that by aggressive salesmanship, adding additional products, and adding products in larger size bottles *91 and in no-return bottles the Dallas Company should be able to operate at a sufficient profit to pay off its outstanding obligations in a reasonable time and return a profit on its stockholder's investment. After July 21, 1967, Mr. B. T. Fooks discussed the suggestions made in his letter of July 21, 1967, to Mr. Rester with Mr. Rester. However, Mr. Rester continued to consider ceasing operation of the Dallas Company. Mr. Fooks discussed with Mr. Finley, Mr. Lewis, and other officers of the Camden Company the advisability of the Camden Company acquiring the stock of the Dallas Company and continuing operation of the Dallas Company. The Dallas Company was an important customer of the Camden Company. Mr. Fooks and Mr. Finley were both of the opinion that the Camden Company would be able, by sending some of its own employees to Dallas, to operate the Dallas Company on a profitable basis and that the results of acquisition of the Dallas Company by the Camden Company would be to maintain an important outlet for the concentrates sold by the Camden Company and to have a profitable operation in the bottling business. Mr. Lewis was of the opinion that there was only a 50-50 chance that the *92 Camden Company would be able to operate the Dallas Company profitably and he advised against its acquisition. However, the decision was made for the Camden Company to acquire the stock of the Dallas Company. It was agreed, however, that, because of the nature of the business of the Camden Company and the inadvisability of showing on the balance sheet of the Camden Company all of the debts of the Dallas Company, Mr. Fooks should take the stock in his name personally for the Camden Company. On October 31, 1967, Mr. Fooks and Mr. Rester entered into an agreement which provided that Mr. Rester was the owner or was in the process of acquiring all the stock of the Dallas Company and was in a position to deliver to Mr. Fooks a clear and unincumbered title to all of the authorized outstanding shares of that company. The agreement provided for the transfer by Mr. Rester to Mr. Fooks of all the outstanding stock of the Dallas Company for $1 and the performance of the terms of the agreement entered into between Mr. Rester and Mr. Fooks. As a part of this agreement Mr. Fooks agreed to assume responsibility for payment of notes of the Dallas Company which had been personally guaranteed by Mr. *93 Rester and to relieve Mr. Rester of his personal responsibility on these notes. The total of such notes on which Mr. Rester was personally liable, which Mr. Fooks assumed as of November 1, 1967, was $178,238.90. Included in this total were three notes to the Camden Company, one for $17,749.49, one for $50,714.39, and one for $9,631.62. It was understood between Mr. Fooks and the other officers of the Camden Company that since his acquisition of the stock was on behalf of the Camden Company his assumption of responsibility for notes on which Mr. Rester was personally liable was also on behalf of the Camden Company. In addition to the notes on which Mr. Rester was personally liable, the responsibility of which was assumed by Mr. Fooks, Mr. Fooks assumed responsibility for Mr. Rester's personal liability on certain indebtednesses of the Dallas Company totaling $10,368.84. It was likewise understood that this assumption was made on behalf of the Camden Company. Under date of November 1, 1967, the following document was signed by Mr. Fooks as chairman of the Camden Company: November 1, 1967 TO WHOM IT MAY CONCERN: Due to T. J. Rester having sold all of his stock and interest in *94 Grapette Bottling Company of Dallas, Inc., he is no longer responsible to The Grapette Company, Inc., for any amounts that might be owed them by this company. THE GRAPETTE COMPANY, INC.
By /s/ B. T. Fooks Chairman The Dallas Company on its Federal income tax returns for its fiscal years ended February 28, 1968, 1969, 1970, and 1971 reported losses before carryovers of net operating loss deduction in the amounts of $64,887.91, $133,661.56, $31,199.49, and $8,767.88, respectively. The losses sustained by the Dallas Company were due to a number of factors including competition encountered from other bottling companies in the Dallas are, unsatisfactory performance of personnel both at the management and sales levels, and outmoded equipment in use in its plant. In the early part of April 1969 the Dallas Company suspended operations. It changed its name first to Grapette-Aristocrat of Dallas, Inc., and later to "Mr." Cola of Dallas, Inc. Under date of April 12, 1969, the Dallas Company entered into a lease-sale agreement of its assets with another corporation, Beverage Bottlers International, Inc. At all times pertinent to this case subsequent to October 1, 1967, Mr. Fooks was the *95 president of the Dallas Company. He signed the lease-sale agreement on behalf of the Dallas Company as its president. The company with which the Dallas Company had the lease-sale agreement did not exercise the option to purchase the assets of the Dallas Company but turned those assets back to the Dallas Company after operating with the assets between 6 and 7 months. As of September 30, 1970, the Dallas Company transferred all of its assets, including its lands and buildings, to the Camden Company. On its Federal income tax return for its fiscal year ending February 28, 1971, the Dallas Company showed assets as of the end of the year of cash in the amount of $271.77, inventories of $319,275.53, and prepaid insurance of $61.11, making a total of $319,608.41. The inventory as shown on this return consisted to a large extent of obsolete bottles and such comparable items of little actual value. During the period November 1, 1967, through October 1, 1970, the Camden Company advanced directly or indirectly to the Dallas Company a total of $312,007.67 consisting of payment by the Camden Company of liabilities of the Dallas Company of $145,431.36, cash advances by the Camden Company to *96 the Dallas Company of $147,047.73, amounts expended by the Camden Company for purchase of bottles used by the Dallas Company of $14,116.98, and trade receivables from the Dallas Company of $5,411.60 which had come into existence after November 1, 1967. The books and records of the Camden Company for its fiscal year ending October 31, 1970, show a charge against its bad debt reserve in the amount of $406,046.97, arrived at as follows: Trade receivables in existence prior to
November 1, 1967, from the Dallas
corporation to B. T. Fooks, Inc.
$ 28,234.25 [1]
Post-November 1, 1967, payments by B. T. Fooks,
Inc., of various pre-November 1, 1967,
liabilities of the Dallas corporation
$145,431.36
Cash advances from B. T. Fooks, Inc., to or for
the benefit of the Dallas corporation from
November 1, 1967, through October 31, 1970,
and not related to pre-November 1, 1967,
liabilities of the Dallas corporation
$147,047.73
Amounts owed B. T. Fooks, Inc., by Grapette of
Fort Worth
$ 33,042.90
Amount of notes owed B. T. Fooks, Inc., by the
Dallas corporation at November 1, 1967
$ 78,095.47
Amounts expended by B. T. Fooks, Inc., for the
purchase of bottles used by the Dallas
corporation after November 1, 1967
$ 14,116.98
Trade receivables from the Dallas corporation
to B. T. Fooks, Inc., coming into existence
after November 1, 1967
$ 5,411.60
Open accounts receivable from employees
(Earl Moore and Jim Woods)
$ 236.51
Remaining reserve for bad debts at end of
year (October 31, 1970)
$ 500.00
Unearned interest write-off
$ (851.13)
Net value of land, building, and equipment
taken in partial satisfaction of amounts
transferred to or for the Dallas corporation
[45,218.65)
*97 The Camden Company on its corporate income tax return for its fiscal year ending October 31, 1970, claimed as a gross amount added to its bad debt reserve $322,094.12, in effect taking a deduction for this amount. The $322,094.12 was arrived at by charging $406,046.97 against its reserve for bad debts for its fiscal year 1970, which reserve as of that time showed a balance of $83,952.85. Respondent in his notice of deficiency to the Camden Company disallowed this claimed deduction with the following explanation: It is determined that the $322,094.12 you claimed as a business bad debt is not allowable because you have not established that a debtor-creditor relationship existed or that the value of property received from Grapette Bottling Company of Dallas did not equal this amount. Accordingly, your taxable income is increased $322,094.12. On brief respondent argues only that the *98 following items are not properly chargeable against the bad debt reserve of the Camden Company, conceding that the other items composing the $406,046.97 charge are properly chargeable against that reserve: Post-November 1, 1967, payments
by the Camden Company of lia-
bilities of the Dallas Company
$145,431.36
Cash advances from the Camden
Company to or for the benefit
of the Dallas Company between
November 1, 1967 and October 31,
1970
147,047.73
Notes owed to the Camden Company
by the Dallas Company on No-
vember 1, 1967
78,095.47
Amounts expended by the Camden
Company for the purchase of
bottles used by the Dallas Company
after November 1, 1967
14,116.98
Respondent in his brief makes no contention that the value of the property received by the Camden Company from the Dallas Company exceeded the $45,218.65 shown as its value on the books of the Camden Company. The deficiency for the fiscal year ended October 31, 1967, of the Camden Company was entirely the result of denial of a loss carryback from the fiscal year 1970. Respondent in his notice of deficiency increased the Fooks' income from dividends as reported on their return by $401,965.40 *99 composed of an amount totaling $31,390.84 paid by B. T. Fooks, Inc. for the benefit of Mr. B. T. Fooks, which amount petitioner on brief concedes to properly constitute an additional dividend, and the following items: Noncollection of Grapette
Bottling Company of Dallas
notes payable to The Grapette
Company, Inc. (Now B. T.
Fooks, Inc.)
$ 78,095.47
Noncollection of amounts
advanced to or spent on behalf
of Grapette Bottling Company
of Dallas wholly owned by B. T.
Fooks as an individual
292,479.09
$370,574.56
Respondent on brief concedes that the amount of $292,479.09 is not properly includable in the income of Mr. and Mrs. Fooks as a dividend from the Camden Company. OPINION The issues presented in this case are entirely factual. It is petitioner's position that the Camden Company is properly entitled to the deduction it claimed for bad debts in the amount of $322,094.12 for its fiscal year ending October 31, 1970, since it was the owner of the stock of the Dallas Company and made the advances which resulted in this claimed bad debt to the Dallas Company in order to protect its own business operations. Petitioner further argues that, since in substance *100 as distinguished from form the Camden Company owned the stock of the Dallas Company, no dividend resulted to Mr. Fooks because of the Camden Company making no effort to collect from him personally notes of the Dallas Company to the Camden Company in the amount of $78,095.47. It is Mr. Fooks' position that he in fact assumed responsibility for certain indebtednesses of the Dallas Company, which had previously been personally guaranteed by Mr. Rester, on behalf of the Camden Company. Respondent contends that the stock of the Camden Company was owned personally by Mr. Fooks, that the advances made by the Camden Company to the Dallas Company were in fact equity contributions by one related corporation to another, and that, since Mr. Fooks personally guaranteed notes of the Dallas Company to the Camden Company, the failure of the Camden Company to collect from Mr. Fooks when payment was not made by the Dallas Company amounted to a dividend to Mr. Fooks. The record shows that even though the document relating to the purchase of the Dallas Company stock showed Mr. Fooks as personally purchasing that stock, the understanding of all of the officers of the Camden Company was that Mr. Fooks *101 was purchasing the stock on behalf of the Camden Company. Not only did Mr. Fooks testify to this effect but so did Mr. Finley who was the vice president of the Camden Company in charge of franchise development and Mr. Lewis who was president of the Camden Company at the time the Dallas Company stock was acquired. The testimony of these witnesses was clear and convincing. From the evidence we conclude that Mr. Fooks took the stock of the Dallas Company in his name, but he purchased the stock on behalf of the Camden Company. In our findings we have found to this effect. We likewise conclude that Mr. Fooks' assumption of liability on the $78,095.47 of notes of the Dallas Company to the Camden Company was merely pro forma as part of his assumption of all liabilities of the Dallas Company which were personally guaranteed by Mr. Rester at the time the Camden Company acquired the Dallas Company stock. The evidence is clear that Mr. Fooks made the guarantee on behalf of the Camden Company. In fact, the record showed that certain notes of the Dallas Company had been guaranteed by the Camden Company prior to the time the Camden Company acquired the stock of the Dallas Company. It might be that *102 had any indebtednesses of the Dallas Company other than that to the Camden Company not been paid by either the Dallas Company or the Camden Company, a creditor of the Dallas Company other than the Camden Company might have enforced payment from Mr. Fooks personally because of failure of public disclosure of the agreement between the Camden Company and Mr. Fooks with respect to the ownership and guarantee of indebtedness of the Dallas Company. However, it appears from this record that all the indebtednesses of the Dallas Company to others than the Camden Company which were not paid by the Dallas Company were paid by the Camden Company. This fact further supports the understanding between Mr. Fooks and the Camden Company. As between Mr. Fooks and the Camden Company, there was no guarantee personally by Mr. Fooks of the indebtedness of the Dallas Company to the Camden Company. For this reason we hold that no dividend resulted to Mr. Fooks in the taxable year ending December 31, 1970, from the noncollection of Dallas Company notes to the Camden Company from him personally by the Camden Company. However, the fact that the Camden Company owned the stock of the Dallas Company does not dispose *103 of the question of whether the advances made by the Camden Company to or for the benefit of the Dallas Company were loans or contributions to capital. This again is a factual issue and from consideration of all the facts we conclude that the post-November 1 payment by the Camden Company of liabilities of the Dallas Company in the amount of $145,431.36, the cash advances from the Camden Company to or for the benefit of the Dallas Company between November 1, 1967 and October 31, 1970, in the amount of $147,047.73, the notes owed to the Camden Company by the Dallas Company on November 1, 1967 in the amount of $78,095.47, and the amount expended by the Camden Company for purchase of bottles used by the Dallas Company after November 1, 1967, in the amount of $14,116.98 were all equity contributions to the Dallas Company by the Camden Company. The record here shows that the actual payment made by the Camden Company for the stock of the Dallas Company was the assumption by the Camden Company of indebtednesses of the Dallas Company, including the indebtedness of $78,095.47 of the Dallas Company to it. The agreement with respect to purchase of the stock recited that all of the outstanding *104 stock of the Dallas Company was purchased for $1 and the performance of the terms of the agreement. The terms of the agreement were the payment by the Camden Company of indebtednesses existing on November 1, 1967, of the Dallas Company if the Dallas Company were unable to pay those indebtednesses. Under the facts of this case it is clear that this assumption of liabilities was the major payment by the Camden Company for the stock of the Dallas Company. When the Camden Company paid the indebtednesses of the Dallas Company such payment was merely an equity contribution to the Dallas Company. The Camden Company contends that even if the liabilities it assumed when the stock of the Dallas Company was acquired were contribution to capital, the advances it made to or on behalf of the Dallas Company after November 1, 1967, created a debtor/creditor relationship and that the failure of the Dallas Company to pay these amounts to the Camden Company resulted in a bad debt properly deductible by the Camden Company as such. The primary argument of petitioner is that it was necessary to the business of the Camden Company that the Dallas Company be kept in operation since the Dallas Company was *105 one of its better customers. From the evidence as a whole we have concluded that the primary motivation of the Camden Company in acquiring the stock of the Dallas Company and in advancing operating funds to the Dallas Company was to make a favorable investment in a concern which the officers and directors of the Camden Company felt could be made a profitable operation. Certainly the Camden Company did not want to lose the benefit of a good customer in the Dallas area, as the officers of the Camden Company testified. However, both Mr. Fooks, Chairman of the board and principal officer of the Camden Company and the Dallas Company, and Mr. Finley, the vice president in charge of franchise, testified that they considered the Dallas Company a good investment and that, properly operated, the company would be able to return a favorable profit on the investment made in it by the Camden Company. A report which had been prepared in July 1967 by employees of the Camden Company had come up with suggestions which, in the view of the persons making the report, if put into effect by the Dallas Company would cause that company to operate profitably. Even more persuasive that the investment of the *106 Camden Company in the Dallas Company was primarily to acquire a profitable investment was Mr. Lewis' testimony that, since in his opinion there was only a 50-50 chance that the Camden Company would be able to operate the Dallas Company profitably, he had advised against the acquisition of the Dallas Company by the Camden Company. Had the primary basis of acquisition of the Dallas Company by the Camden Company been the necessity of retaining operations by the company in the Dallas area, Mr. Lewis would logically have judged the value to the Camden Company of acquiring the Dallas Company not on the basis of the profitability of the Dallas Company but rather on its value to the Camden Company as a customer even if it were operated only on a break-even basis. From the evidence in the record as a whole we conclude that the primary purpose for the acquisition of the Dallas Company by the Camden Company and for the advances made by the Camden Company to the Dallas Company was the acquisition and protection of an investment. All these advances were in our view capital investments by the Camden Company in the Dallas Company. Although various criteria, such as the capitalization of the corporation *107 to which advances are made, whether the advances are evidenced by notes or other written instrument and, if so, what provisions, if any, are made for payment of interest, have been considered in determining whether advances by a stockholder to a corporation create a debtor/creditor relationship or are in fact capital contributions, the ultimate question is a factual one of whether in terms of economic reality the advances constitute risk capital subject to the fortunes of the corporate venture or are true debts which the parties realistically intend will be repaid. Fin Hay Realty Co. v. United States,398 F. 2d 694 (3rd Cir. 1968); and Smith v. Commissioner,370 F. 2d 178 (6th Cir. 1966), affirming a Memorandum Opinion of this Court. Although there is testimony in this record that the advances by the Camden Company to the Dallas Company were made to keep a good customer of the Camden Company in business and that the stock of the Dallas Company was acquired for this purpose, there is no testimony or other evidence bearing directly on the intent of the parties with respect to repayment of the advances from the Camden Company to the Dallas Company. A *108 review of the evidence as a whole clearly indicates that no such repayment was intended. The clear inference from the record is that prior to the purchase of the stock of the Dallas Company by the Camden Company the Camden Company had expected repayment of the notes of the Dallas Company which it held totaling $78,095.47 either by the Dallas Company or by Mr. Rester. However, when the stock of the Dallas Company was purchased for the Camden Company and Mr. Rester released of any liability on these notes by the Camden Company, the Camden Company ceased to expect repayment of the notes until such time as the Dallas Company had paid all of its other indebtednesses and was a profitable operation, if in fact the Camden Company expected such repayment, even under these circumstances. There is no indication from the record that other advances by the Camden Company to or on behalf of the Dallas Company were evidenced by notes or any other written instrument or were in fact considered by either the representatives of the Camden Company or of the Dallas Company to be other than contributions by the Camden Company to the capital of the Dallas Company. Our holding that all the amounts which *109 still remain in issue here which were advanced to the Dallas Company by the Camden Company constitute capital contributions by the Camden Company to the Dallas Company disposes in favor of respondent of the issue of whether the Camden Company properly treated its advances to the Dallas Company as bad debts. [2]
*110 Petitioners themselves, apparently recognizing the deficiency in the evidence with respect to the existence of a debtor/creditor relationship between the Camden and the Dallas companies, in their brief primarily contend that the Camden Company in 1970 realized a loss "from an investment in a subsidiary corporation that was an integral part of the business activities of the Camden Corporation and which had been acquired solely for the purpose of furthering the business activities of the Camden Corporation." In this argument petitioners point out that although section 165(g)(1), I.R.C. 1954, [3] provides if a security which is a capital asset becomes worthless during the taxable year the loss sustained shall be treated as a loss resulting from the sale or exchange of the capital asset on the last day of the tax year in which the security becomes worthless, there are cases which hold certain investments to be so directly related to the operating business of the corporation making the investment that a loss on the investment is considered as an ordinary loss under section 165(a) and not as a capital loss under section 165(g)(1). In support of their position petitioners cite Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955); *111 FS Services, Inc. v. United States,413 F. 2d 548 (Ct. Cls. 1969); and certain other cases of similar import. Respondent in his reply brief argues that this is a new issue raised by petitioners for the first time on brief and is therefore not properly before the Court, relying on Estate of Akos Anthony Horvath,59 T.C. 551 (1973). In the Horvath case, as we have in numerous other cases, we pointed out, at 556, that a new issue not raised in the pleadings would ordinarily not be heard by the Court. A review of the record in this case indicates that although there are no precise allegations in the pleadings that the advances by the Camden Company to the Dallas Company were deductible losses, there are allegations which might be considered to encompass such a contention. Also, during the trial it was clear that petitioners were making such an alternative contention and respondent made no objection to this issue being tried. We therefore consider that this issue is properly before the Court. See Rule 41(b), Tax Court Rules of Practice and Procedure.
It is *112 well settled that amounts contributed to the capital of a corporation by its shareholders are ordinarily capital investments of the same type as the amount originally paid for the corporate stock. See James O. Gould,64 T.C. 132, 134 (1975); and Electrical Fittings Corporation,33 T.C. 1026, 1031 (1960). However, in both the Gould and Electrical Fittings Corporation cases we pointed out that, even though the general rule is that a loss on stock or a capital advance to a corporation is a capital loss, in the unusual circumstance where the purpose of the investment in the stock or the advance to the corporation is to insure a vital source of supply or to protect a vital business interest of the person purchasing the stock or making the advance, the advance may be deducted as an ordinary loss or an ordinary and necessary business expense. The determination of whether an advance is for the purpose of obtaining inventory or for some other business interest of the person making the advance is a question of fact. In the Electrical Fittings Corporation case we pointed out that where an investment in another corporation was made primarily to enhance *113 the business of the corporation making the investment the particular section under which the deduction is allowed, whether as cost of goods sold, as an ordinary and necessary business expense or as a business loss, is immaterial. The question to be decided is whether the advance or investment is made by the stockholder primarily to further its own business interests or to obtain a profit from the business of the other corporation. Likewise in the Gould case we pointed out that whether an item is considered as an ordinary loss under section 165(a) sustained by the stockholder or as a deductible business expense under section 162(a), there is no difference in the requirement that the taxpayer claiming the loss or ordinary deduction show the proximate connection of the expenditure to its own trade or business. In our view petitioners have failed to meet the burden of showing that the advances by the Camden Company to the Dallas Company were sufficiently related to the Camden Company's business to justify the amount being deducted either as an ordinary loss under section 165(a) or as a business expense under section 162(a). There is testimony in the record of the importance of the *114 Dallas area, in which the Dallas Company operated, to the Camden Company in its business of selling concentrates. However, there is no specific evidence to show that this area could not well be covered through distributors or bottlers other than the Dallas Company or what percentage of petitioner's sales were made to the Dallas Company. The record shows petitioner's total sales and the total sales of the Dallas Company, but it also shows that the Dallas Company sold products other than those made from petitioner's concentrates. Even the total sales of the Dallas Company is not a sufficient percent of the total sales of the Camden Company to warrant a conclusion that the Dallas Company was vital to the Camden Company as a customer. More important, however, is the direct testimony of the witnesses which shows that the officers of the Camden Company viewed an investment in the Dallas Company as a good investment in a company with an opportunity to make a profit through the operations of that company. Considering the testimony of these witnesses as a whole and not merely isolated statements, in our view their testimony shows that the acquisition of the Dallas Company by the Camden Company *115 was primarily to obtain a business which if properly operated would return a profit to its stockholder, the Camden Company. While the operation of this business might incidentally benefit the Camden Company by increasing its sales somewhat over the amount of sales that might occur in the Dallas area if the product made from the Camden Company's concentrates was distributed in that area by a bottler unrelated to the Camden Company through stock ownership, in our view the increase in distribution of products made from the Camden Company's concentrate in the Dallas area was totally secondary to the intent by the Camden Company to make a profit through its operation of the Dallas Company. Although petitioners argue that the Camden Company was motivated in investing in the Dallas Company by a desire to retain the Dallas market, there is no clear evidence in the record that the Camden Company could not have had as much of its product distributed in the Dallas area through bottlers other than the Dallas Company as could be distributed by the Dallas Company. Considering the evidence as a whole we conclude that the loss sustained by the Camden Company in connection with its advances to the *116 Dallas Company was a capital loss and must be so treated by the Camden Company in the computation of its tax liability for its fiscal year ending October 31, 1970. As we stated previously we consider that respondent is no longer contending for the position taken in his notice of deficiency that the Camden Company in fact received from the Dallas Company assets of a value in excess of the amount shown on its books to have been received from the Dallas Company. There is much testimony in the record concerning whether the bottle inventory of the Dallas Company had any value. If respondent has not abandoned the position that the assets received by the Camden Company from the Dallas Company were not properly valued, we hold that the record clearly shows that they were properly valued since the bottles and similar items of the Dallas Company, which were either brought to the premises of the Camden Company when the real estate and property of value of the Dallas Company was transferred to the Camden Company or totally abandoned by the Dallas Company, had only a minimal value. We therefore conclude, as we believe respondent now recognizes, that the only amount received by the Camden Company *117 from a transfer to it of the assets of the Dallas Company was the $45,218.65 net value of land, buildings, and equipment taken by the Camden Company in partial satisfaction of the amounts it had transferred to the Dallas Company. The record does not show the nature of the unearned interest write-off in the amount of $851.13, but this item is apparently not in dispute between the parties. Decision will be entered under Rule 155.
Footnotes
1. Although this figure is stipulated, there is obviously a five cent error and the figure should be $28,234.20 if the charge against the bad debt reserve was computed correctly mathematically since the other figures used in the computation are shown on exhibits as well as in the stipulation.↩
2. Since respondent continued in his brief to take the position that the stock of the Dallas Company was owned in substance as well as in form by Mr. Fooks personally and not by the Camden Company he discussed the issue of how a capital contribution by one "brother-sister" corporation to another should be treated, pointing out that in C. M. Gooch Lumber Sales Co.,49 T.C. 649 (1968), we held that advances by one corporation to another to which it was related but in which it was not a stockholder constituted contributions to capital. There are of course cases in which we have held that advances by one corporation in which an individual owned all of the stock to another corporation in which that individual owned all of the stock may, under certain circumstances, constitute a dividend by the corporation making the advances to the sole shareholder of both corporations. See Rapid Electric Co.,61 T.C. 232, 239↩ (1973), and cases there cited. These cases are discussed by petitioners in their opening brief but, since respondent conceded in his opening brief that no portion of the advances by the Camden Company to the Dallas Company other than the $78,095.47 of notes were dividends to Mr. Fooks, these cases have no relevance. Respondent in his brief also conceded that if we held that no debtor/creditor relationship existed between Mr. Fooks and the Camden Company with respect to the notes which totaled $78,095.47 "then respondent will concede that there was no constructive dividend of the $78,095.47 in 1970." We have, however, disposed of this issue in our opinion, holding that Mr. Fooks did not personally guarantee the notes of the Dallas Company to te Camden Company and that the understanding between Mr. Fooks and the Camden Company was to this effect. On this basis we determined that Mr. Fooks received no dividend in the amount of $78,095.47 in 1970 without reference to respondent's concession.
3. All references are to the Internal Revenue Code of 1954, unless otherwise noted.↩