VIRGINIA H. WILDES, ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondents WILDES v. COMMISSIONER
Docket No. 7612-76, 7613-76, 7657-76.
United States Tax Court
T.C. Memo 1980-298; 1980 Tax Ct. Memo LEXIS 285; 40 T.C.M. (CCH) 871; T.C.M. (RIA) 80298; August 6, 1980, Filed William E. Johnson, III, and Russell S. Johnson, for the petitioners. James R. Turton, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner, in his statutory notices of deficiency, determined deficiencies in petitioners' Federal income tax as follows: Taxable
Petitioner
Year
Deficiency
Virginia H. Wildes
1971
$ 80.78
Patricia M. Harrison
1969
3,528.73
1970
1,215.19
1971
12,125.55
1973
24,898.80 [2]
Estate of Donald G.
1969
11,316.73
Wildes, deceased,
1970
1,193.42
et al
*287 Due to concessions the issues remaining for our decision are: (1) Whether the stock of Argus Production Company became worthless in the taxable year 1969 entitling petitioners to a deduction under section 165(g), Internal Revenue Code of 1954; [3]
(2) Whether advances in the amount of $177,500 made to Donovan Investment Company (a partnership) by Petitioners Wildes became worthless in the taxable year 1969 so as to allow Petitioners Wildes a deduction under section 166; (3) Whether Donovan Investment Company incurred short-term capital losses for the taxable years 1969 and 1970 in the respective amounts of $170,224.26 and $50,000; (4) Whether advances made by Petitioners Wildes to various individuals entitle them to a short-term capital loss deduction in the taxable year 1969 because of the worthlessness of such advances purported to be loans; (5) Whether Petitioner Harrison is entitled to a deduction for legal expenses paid by Petitioner Harrison in her taxable year 1971; and (6) Whether a debt owing to Petitioner Harrison, which arose due to a payment by her as *288 guarantor on a note payable by Don Oliver became worthless in the taxable year 1971. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, the supplemental stipulation of facts and all exhibits attached thereto are incorporated by this reference. Mrs. Virginia H. Wildes and the Estate of Donald G. Wildes (herein sometimes referred to as Petitioners Wildes) and Mrs. Patricia M. Harrison (herein sometimes referred to as Petitioner Harrison) resided in Dallas, Texas, at the time they filed their respective petitions in the instant cases which have been consolidated for purposes of trial, brief, and opinion. Petitioner Harrison filed per Federal income tax returns for the taxable years 1969, 1970 and 1971 and a joint return with her husband for the taxable year 1973 with the Director of the Internal Revenue Service Center at Austin, Texas. In addition, Petitioner Harrison filed an amended return for the taxable year 1969 on April 16, 1971. Petitioners Wildes filed joint income tax returns for the taxable years 1969 and 1970 with the Director of the Internal Revenue Service Center at Austin, Texas. Petitioners Wildes filed a joint amended return *289 for the taxable year 1969 on April 19, 1971. Petitioner Virginia Wildes filed her Federal income tax return for the taxable year 1971 with the Director of the Internal Revenue Service Center at Austin, Texas. At all relevant times in the instant case petitioners owned stock in Argus Production Company (herein Argus). Argus was incorporated on June 6, 1962, by William Wildes who was the father of Petitioner Harrison and Donald G. Wildes. The purpose for which Argus was organized was to explore for, develop and produce oil and gas. Following incorporation William Wildes purchased 200,000 shares of Argus stock at a price of $2 per share. He then gave 1,500 shares to both Petitioner Harrison and Donald G. Wildes. On July 11, 1963, Argus purchased property which for purposes of this case will be referred to as the Saratoga property. William Wildes lent $600,000 to Argus to accomplish the purchase of the Saratoga property and in exchange received a promissory note from Argus. The note was secured by a deed of trust on the Saratoga properties executed by Argus as mortgagor. On July 23, 1963, William Wildes died. Following his death the promissory note from Argus in the *290 amount of $600,000 was divided into twelve separate notes ($50,000 each) and payable by Argus as follows: Number of Notes
Payable To
1
Donald Wildes
3
Virginia Wildes
4
Donovan Investment Company *
4
Patricia Harrison
Donald Wildes (herein Mr. Wildes) assumed charge of all policy-making decisions related to the operation of Argus which included the purchase of property as well as the exploration for and production of oil and gas from such property. Mr. Wildes, a graduate of the University of Oklahoma with a degree in petroleum engineering, knew that the operation of the Saratoga property was an expensive and speculative proposition. The Saratoga property was on the periphery of a salt dome which caused any production of oil and gas to be extremely hazardous and unpredictable. *291 Consequently, it was difficult to obtain adequate financing from outside sources to fully explore and develop the Saratoga property. For these reasons Mr. Wildes and Petitioner Harrison sought the financial aid of their mother, Marie Wildes, who over the years advanced $789,618.40 to Argus in return for various unsecured promissory notes. She continued to make advances until her death on April 15, 1969. In addition, Marie Wildes as trustee of the Arthur Gould Trust, [4] advanced $261,913.62 to Argus from 1963 to 1969. The advances were also made in return for unsecured promissory notes executed by Argus. Mr. Wildes suffered from serious medical problems which apparently began in 1962 when he experienced a heart attack. Mr. Wildes again experienced heart attacks in 1967, 1968 and 1969. On each occasion he spent from four to eight weeks recuperating which was followed by a return to work at Argus on a limited basis. At first he would spend a few hours at a time at the office and gradually increase his working activities. In 1968 Mr. Wildes attempted *292 to liquidate Argus because of his failing health and the inability of Argus to effectively operate due to a lack of adequate financing. The only source of capital came from petitioners and Marie Wildes.For these reasons Argus entered into negotiations with General Energy Corporation (herein GEC) in December 1968. The negotiations included the prospective sale of the Saratoga property and property located in New Mexico and Louisiana. GEC initially agreed to pay $630,000 in cash for the property and an additional $600,000 from the production, if any, of the purchased property. Mr. Wildes expected little or no money from anticipated oil production. The negotiations failed to produce a completed sale due to the inability of GEC to obtain the financing needed to consummate the purchase. [5]
For its fiscal year *293 ended June 30, 1969, Argus carried on its corporate books liabilities in the amount of $2,303,278 and assets with a book value of $1,147,344.The liabilities included the advances made by Marie Wildes individually ($789,618.40) and as trustee ($261,913.62) along with the $600,000 in notes payable to petitioner and Donovan plus interest that had accrued in the amount of $237,252.18 or a total amount of $1,888,784.20. The assets included the Saratoga property and various oil and gas leases located in Oklahoma, Texas, Louisiana, and New Mexico. Following his heart attack in October 1969, Mr. Wildes recuperated for a period of time and gradually began to devote time to the operation of Argus by going to the office on a limited basis. Mr. Wildes worked at the office one time in January 1970 prior to his death on January 4, 1970. After Mr. Wildes died, Argus entered into negotiations with Triton Oil and Gas Company (herein Triton). The negotiations included the property previously considered by GEC in addition to other oil and gas leases located in Texas. Triton consummated the purchase of these various leases in the latter part of 1970 and in consideration agreed to pay $200,000 *294 in cash and 30,000 shares of Triton stock to Argus. At the time of the purchase Triton and Argus agreed that the value of the Triton stock was $5 per share. The proceeds from the sale were used to partially satisfy numerous debts as well as advances made by petitioners. Argus continued in its corporate form following the sale to Triton. By way of amended Federal income tax returns for the taxable year 1969 petitioners claimed a long-term capital loss deduction under the provisions of section 165(g) claiming that their Argus stock had become worthless in 1969. The Commissioner in his statutory notice of deficiency determined that Petitioner Harrison was not entitled to deductions under section 165(g) because it had not been established that her Argus stock became worthless in 1969. With respect to Petitioners Wildes Commissioner treated their amended Federal income tax return for the taxable year 1969 as a claim for refund. Therefore, the issue of whether their Argus stock became worthless in 1969 is before us due to affirmative allegations contained in the petition. Donovan Investment Company (herein Donovan), a partnership, was formed in 1964 for the purpose of drilling *295 for oil, thereby enabling Marie Wildes to obtain a disproportionate share of the tax deductible expenses of the partnership. Donald Wildes and Patricia M. Harrison became partners by contributing two promissory notes of Argus in the amount of $50,000 each. [6] Marie Wildes became a partner of Donovan by contributing securities with a value exceeding $180,000. An agreement existed between Donovan and Argus whereby Argus took charge of Donovan property for the purpose of development and production of oil. The property which was the subject of the agreement was purchased by Donovan at a cost of $902,955 and will be referred to as the Clay leases. These leases were the only property interests acquired by Donovan. The Clay leases were of a quality which made them easier to operate than the Saratoga properties owned by Argus. However, the leases still required a considerable amount of operating expertise and capital because they had not been fully developed when they were purchased by Donovan. *296 The only source of capital was the Wildes family which included Marie Wildes, Donald Wildes and Patricia M. Harrison. In 1969 Donald Wildes advanced $191,000 to Donovan. The advance was made for the purpose of developing and drilling wells on the Clay leases as well as advancing money to Argus so that it could pay operating bills which related not only to the Clay leases but also to Argus properties. At the time the advance was made Argus was unable to pay the operating expenses due to a lack of cash. Donovan executed various notes which were unsecured in exchange for the advances as follows: Date Executed
Amount
Due Date
Jan. 22, 1969
$25,000
Jan. 22, 1970
Apr. 10, 1969
30,000
Apr. 10, 1970
May 6, 1969
15,000
May 6, 1970
July 15, 1969
6,000
July 15, 1970
Aug. 6, 1969
5,000
Aug. 6, 1970
Aug. 20, 1969
10,000
Aug. 20, 1970
Aug. 29, 1969
25,000
Aug. 29, 1970
Sept. 3, 1969
10,000
Sept. 3, 1970
Oct. 17, 1969
20,000
Oct. 17, 1970
Oct. 31, 1969
20,000
Oct. 31, 1970
Dec. 1, 1969
15,000
Dec. 1, 1970
Dec. 19, 1969
10,000
Dec. 19, 1970
Donald Wildes apparently made these advances with the hope of making Donovan a profitable operation. *297 In addition the books of Donovan indicated that Marie Wildes advanced $225,873.66 to Donovan in her individual capacity and $14,120.19 in her capacity as trustee of the Arthur Gould Trust. [7] The total amount of liabilities as reflected on the books of Donovan for its taxable year 1969 was $870,427 which included the above advances. No interest or principal was ever paid by Donovan on these advances. The books of Donovan also indicate that at the close of its taxable year 1969 it held assets with a value of $749,008. Virginia Wildes and the Estate to Donald Wildes claimed on their joint amended Federal income tax return for the taxable year 1969 a deduction in the amount of $177,500 [8] for a short-term capital loss due to the worthlessness of the notes receivable from Donovan in the principal amount of $191,000. Mrs. Wildes and the executors of the Estate of Donald G. Wildes filed the joint amended return on April 19, 1971. The Commissioner did not consider the amended return when he issued his statutory notice of deficiency but rather considered the amended *298 return as a claim for refund, due to the fact that petitioners have affirmatively pleaded for a refund based on the advances ($191,000) made to Donovan in 1969. Mr. John Hill entered into a joint venture agreement with Argus at a time in 1964 immediately prior to his marriage to Petitioner Harrison. Under the agreements dated September 4 and 5, 1964, Argus was to purchase a portion of oil and gas property owned by Hill and others who were operating as a partnership. Mr. Hill received $50,000 from Donovan and Argus agreed to pay for the drilling expenses which related to the joint venture in the approximate amount of $450,000. The $50,000 advanced to Mr. Hill was to be repaid to Donovan out of the money Argus planned to invest ($450,000) with Mr. Hill's partnership. The negotiations were completed but Argus elected not to proceed with the joint venture. Mr. Hill did not repay the $50,000 *299 to Donovan. Instead Mr. Hill and his partnership filed a lawsuit against Argus for its failure to comply with the agreement to participate in the drilling of certain oil and gas wells. The lawsuit was settled but the matter of the $50,000 advance was not disposed of any the settlement. In 1968 Mr. Hill, while denying any legal obligation to repay the $50,000 to Donovan, agreed to pay $50,000 to Donovan when Cominco American, Incorporated (herein Cominco), exercised its option to purchase shares of Hill Chemicals, Inc., stock owned by Mr. Hill. Mr. Hill and Mrs. Harrison were in the process of getting a divorce at that time and the agreement to pay $50,000 was part of the final divorce settlement. Difficulties arose between Mr. Hill and Cominco in 1970 which extinguished their earlier agreement relating to Cominco's option to buy Hill Chemicals stock. However, in 1970 and 1972 Cominco did purchase stock from Mr. Hill which was included in their previous option agreement. On September 2, 1969, John Hill executed a promissory note in the amount of $35,000 for the benefit of Petitioner Harrison. The note was non-interest bearing and was secured by a pledge of collateral agreement *300 which enabled Mr. Hill to have the option of satisfying the note with Hill Chemicals, Inc., stock. However, this option was subject to various agreements and contracts Mr. Hill had with others. In addition, the note provided for the payment of 10 percent interest in the event Mr. Hill was delinquent. In 1971 Petitioner Harrison, Mr. Hill having become delinquent on the note, obtained a judgment against Mr. Hill whereby Mr. Hill was ordered to pay Petitioner Harrison $35,000 plus interest in the amount of $401.32 and attorney fees in the amount of $3,540.13. The court, through its order, granted Mr. Hill the option of satisfying the judgment by transferring Hill Chemicals, Inc., stock in sufficient amount and value, i.e., $38,941.45. Mr. Hill exercised the option granted by the court and transferred adequate stock to Petitioner Harrison. Petitioner Harrison then paid $3,628.45 in cash to her attorney in 1971 which was followed by the sale of the stock in 1972 for $32,000. [9] (Petitioner calculated a loss from the sale in the amount of $3,000 due to the fact that she used $35,000 as the basis for her stock received in 1971 from Mr. Hill.) *301 In 1969, during the same time that Donald Wildes advanced $191,000 to Donovan, Donovan advanced $189,150 to Argus for the purpose of satisfying various expenses of Donovan as they related to the operation of the Clay leases as well as expenses incurred by Argus in the operation of its oil and gas properties. At the close of 1969 Donovan books indicated an amount of $170,224.26 as owing from Argus. Donovan continued to operate as a partnership in 1970 and advance money to Argus as it had done in 1969. Donovan advanced money to Argus in 1969 for the reason that Argus was unable to meet the current expenses of operating the various oil and gas property for which it was responsible. Petitioner Harrison and Petitioners Virginia Wildes and the Estate of Donald G. Wildes claimed on their amended Federal income tax returns for the taxable year 1969 a short-term capital loss in the amount of $72,436.16 as their share of a partnership (Donovan) loss of $220,224.26. [10] The partnership loss was due to (1) an alleged non-business bad debt deduction in the amount of $50,000 allegedly owed to Donovan by John Hill; [11] and (2) the unpaid advances in the amount of $170,224.26 made by Donovan *302 to Argus in in 1969. Petitioner Harrison also deducted for the taxable year 1971 the legal expenses ($3,628.45) which she incurred pursuant to her obtaining a judgment against John Hill in 1971. With respect to Petitioner Harrison, the Commissioner in his statutory notice of deficiency determined that: (1) the claimed loss of $72,436.16 from Donovan was not allowable because it had not been established that the $50,000 note of John Hill and the $170,224.26 advances to Argus became worthless in the year 1969; and (2) the legal expenses in the amount of $3,628.45 incurred in collecting a note from John Hill was not allowable in the year 1971 because it was not paid by Petitioner Harrison. In addition, the Commissioner treated *303 the amended return for 1969 of Petitioner Virginia Wildes and the Estate of Donald Wildes as a claim for refund which is the reason this issue is before us. In April and May 1969 Donald Wildes advanced $5,000 to Mr. Sam Harper. Mr. Harper executed two promissory notes in the amounts of $2,500 each pursuant to these advances on April 29, 1969 and May 23, 1969. Mr. Harper was a miner and owned some gold claims with which he attempted to interest Donald Wildes.He succeeded and Mr. Wildes lent $5,000 to him for the purpose of developing various claims and in return Mr. Wildes received a 7 percent royalty interest in the claims Mr. Harper had discussed with him. In addition, Mr. Harper agreed to pay $5,000 to Donald Wildes from the proceeds of the claims in the event that payment on the notes had not occurred prior to their due dates, i.e., 120 days from the execution of the above-described notes. Mr. Harper never repaid these advances to Donald Wildes and on February 10, 1970, counsel for the Estate of Donald Wildes notified Mr. Harper that he was delinquent in satisfying the notes executed in April and May 1969. Subsequently, a judgment on the two notes was obtained on March 24, 1972. *304 On December 18, 1969, Donald Wildes advanced $1,000 to Mr. J. T. Cook who in turn executed a non-interest bearing demand note in the amount of $1,000. Mr. Cook was in arrears in his child support payments and prevailed upon Mr. Wildes to advance him $1,000. At the time the money was advanced, Mr. J. T. Cook was unable to repay the loan due to the fact that he did not own any assets. Mr. Cook never paid the $1,000 to Donald Wildes and on January 4, 1972, a judgment was obtained against him. On March 24, 1961, Donald Wildes obtained a judgment against Oscar Hood in the amount of $6,618.80. Following the entry of judgment Mr. Wildes and his attorney attempted to collect payment. They made periodic contacts with Mrs. Oscar Hood to ascertain the possibility of recovery on their judgment against Mr. Hood. In 1969 Mr. and Mrs. Hood separated. As a result, Mr. Wildes lost contact with Mrs. Hood and thereby lost any means of ascertaining any possible collection on the judgment against Mr. Hood. In 1971 Petitioner Harrison arranged for a loan to be made by the Republic National Bank of Dallas to Don Oliver in the amount of $12,000. [12] Mr. Oliver's wife was a close friend of *305 Petitioner Harrison and because Mr. Oliver had lost his job, suffered a severe heart attack, and needed money to start another business. Petitioner Harrison as a favor to Mrs. Oliver signed the loan agreement as guarantor. On October 15, 1971, Petitioner Harrison paid $12,179.63 to the bank in her capacity as guarantor. Mr. Oliver was financially unable to honor his obligation with the bank at the time the note became due just as he was at the time the note was executed. Petitioner never attempted to obtain a judgment against Mr. Oliver who continued to remain in financial difficulties. Petitioners Virginia Wildes and the Estate of Donald Wildes claimed a short-term capital loss on their amended return for their taxable year 1969 in the amount of $12,618.80 which represented the total amount advanced to Messrs. Harper, Cook and Hood. Petitioners Wildes claimed the deduction based upon their determination that the advances became worthless in the taxable year 1969. The Commissioner accepted their amended return *306 as a claim for refund and, therefore, this issue is before us due to petitioners' affirmative allegations contained in their petitions. For her taxable year 1971 Petitioner Harrison claimed a bad debt deduction in the amount of $12,179.63 for the payment to Republic National Bank of Dallas as guarantor on the note of Mr. Donald Oliver. The Commissioner, in his statutory notice of deficiency, determined that Petitioner Harrison was not entitled to the claimed deduction because it had not been established that the debt became worthless in the taxable year 1971. OPINION The first issue for our decision is whether Argus stock owned by petitioners became worthless in the taxable year 1969. Petitioners argue that the stock became worthless in 1969 for the following reasons: (1) the sale of Argus property to GEC was not consummated; (2) the death of Marie Wildes on April 15, 1969, severely limited sources from which Argus could expect necessary capital to carry on its oil and gas operations; (3) the declining health of Donald Wildes who experienced his fourth heart attack during 1969 which rendered him disabled and led to his death on January 4, 1970. Respondent contends that petitioners *307 have failed in their burden of proving the worthlessness of their Argus stock in 1969. More specifically, respondent argues that petitioners have failed to establish the fair market value of Argus assets as of December 31, 1969 and consequently petitioners have failed to establish that the liabilities of Argus exceeded the liquidating value of Argus assets. In response, petitioners argue that for the fiscal year ended June 30, 1969, Argus carried on its corporate books assets with a value of $1,147,344 and liabilities in the amount of $2,303,278. Included in the liabilities were the advances made by Marie Wildes, in her capacity as an individual and as trustee ($789,618.40 and $261,913.62, respectively) and the $600,000 lent originally by William Wildes in 1963 together with accrued interest in the amount of $237,252.18. In order to sustain a deduction under section 165(g) petitioner has the burden of proof and must develop facts which go beyond a subjective test in establishing the worthlessness of stock in the taxable year claimed. Boehm v. Commissioner,326 U.S. 287 (1945).We have long followed the standards set forth in Morton v. Commissioner,38 B.T.A. 1270, 1278-1279 (1938), *308 affd. 112 F.2d 320 (7th Cir. 1940) wherein we stated: [It] is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock. The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation *309 . Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. [Emphasis added.] Under this standard petitioners must prove both the absence of a liquidating value of its assets, i.e., an excess of assets (fair market value) over liabilities, and an absence of a reasonable expectation that assets would exceed liabilities in the future. Steadman v. Commissioner,50 T.C. 369, 376 (1968), affd. 424 F.2d 1 (6th Cir. 1970), cert. denied 400 U.S. 869 (1970); Morton,supra.
Petitioners argue that the liabilities of Argus far exceeded the *310 value of its assets so as to establish the fact that Argus had no liquidating value as of the close of the taxable year 1969. While petitioners do not specifically point to a specific amount regarding the fair market value of Argus assets, they argue that the liabilities exceeded the book value given by Argus ($1,147,344), the value negotiated by GEC ($630,000 cash plus $600,000 from future production, the latter figure considered to have de minimus value), and the amounts actually paid by Triton ($200,000 cash plus 30,000 shares of Triton stock at $5.00 per share). At first blush petitioners' position appears to have satisfied the first test set forth in Morton,supra. However, respondent counters by arguing that the advances made by petitioners and Marie Wildes to Argus do not constitute valid liabilities of Argus and, therefore, their inclusion in the total liabilities of Argus does not render an accurate reflection of Argus' financial condition. In so arguing respondent would eliminate the following amounts from Argus' liabilities: Source
Amount
Interest
William Wildes
$ 600,000.00
$ 237,252.18
Marie Wildes
789,618.40
0
Marie Wildes,
Trustee of Arthur Gould
Trust
261,913.62
0
$1,651,532.02
$1,888,784.20
*311 Respondent first contends that the $600,000 originally advanced to Argus by William Wildes constituted a contribution to capital and, therefore, should not be included as a liability of Argus. At the time William Wildes advanced $600,000 to Argus he received a promissory note from Argus which was secured by a deed of trust on the property acquired with the money lent by William Wildes. Following the death of William Wildes, petitioner received new promissory notes from Argus which by their terms expired in 1966. From 1964 to 1966 no principal or interest was paid to petitioners and following the expiration of the notes in 1966, no renewal of such took place until 1970. We have examined the evidence before us and can come to no other conclusion than that petitioners did not expect repayment from Argus and that they did not treat the promissory notes as evidence of a valid debt. Based on the record before us no promissory notes existed from 1966 to 1970, the renewal notes having expired in 1966. Moreover, no interest was paid by Argus or demanded by petitioner during that time. At an early stage of the oil and gas operations it was quite evident that the type of property Argus *312 endeavored to develop demanded large amounts of capital. This demand continued throughout the time Donald Wildes managed Argus. The continued advances made by Marie Wildes over this same time period in return for unsecured promissory notes is evidence that there was little, if any, expectation of repayment. In 1969 GEC placed $75,000 in escrow pursuant to their negotiations with Argus regarding the purchase of a portion of Argus property. When the negotiations failed to produce a binding contract, Argus retained the $75,000. However, rather than pay any interest to Marie Wildes or petitioner, Argus invested the money in the property. The fact that the notes in question were renewed on January 2, 1970, is of no moment due to the fact that our focus is upon the taxable year 1969, a period three years after the notes had expired. Accordingly, we find that the principal amount of $600,000 and the amount of $237,252.18 designated as "interest" do not constitute a debt or liability of Argus.Likewise, we find that the advances made by Marie Wildes do not constitute liabilities of Argus. At the insistence of he daughter and son Marie Wildes advanced $1,051,532.02 to Argus from 1964 *313 to 1969. The advances were needed by Argus due to the fact that adequate financing could not be obtained elsewhere. While Argus executed promissory notes in exchange for the advances, it did not pledge any security in the event of its default. Moreover, from 1964 to 1969 Argus failed to pay any interest on principal on the notes executed on behalf of Marie Wildes. Accordingly, we find that, based upon the facts in the instant case, the economic reality of the advances made by Marie Wildes did not create a valid debtor-creditor relationship with Argus. See Trans-Atlantic Company v. Commissioner,469 F.2d 1189, 1193 (3d Cir. 1972), affg. a Memorandum Opinion of this Court; Fin Hay Realty Co. v. United States,398 F.2d 694 (3d Cir. 1968). Consequently, the $1,051,532.02 cannot be characterized as a liability of Argus for purposes of determining the excess of liabilities over assets. Therefore, the liabilities of Argus are reduced from $2,303,278 to $414,493.80. As we stated earlier, it is incumbent upon petitioners to establish an excess of liabilities over the fair market value of Argus assets as of December 31, 1969. In this context, it is *314 appropriate to examine the actual value of the assets of Argus on an item-by-item review. Steadman,supra.The only evidence petitioners have produced is the amount GEC tentatively agreed to pay for a portion of Argus assets and the amount Triton actually paid ($350,000) in December 1970 for a portion of Argus assets. Looking at the evidence in light most favorable to petitioners we can conclude that Argus held assets which had a value which ranged between $630,000 and $350,000. Such conclusion falls short of demonstrating an excess of liabilities ($414.493.80) over assets (from $630,000 to $350,000). We, therefore, hold that petitioners have failed in their burden of proving that their Argus stock became worthless in the taxable year 1969. The second issue for our decision is whether various advances made by Petitioners Virginia Wildes and the Estate of Donald G. Wildes to Donovan Investment Company became worthless in the taxable year 1969 and qualify for a business bad debt deduction under section 166 in the amount of $177,500. Petitioners take the position that in 1969 Donovan became insolvent and its moving force, Donald G. Wildes, became hopelessly *315 incapacitated due to his fourth heart attack. For these reasons petitioners contend that the advances Donald G. Wildes made to Donovan in 1969 in the amount of $191,000 (less $13,500 he owed to Donovan) became worthless in the same year. Petitioners base their position on the fact that the books of Donovan reflected liabilities in the amount of $870,427 and assets with a value of only $749,008. Consequently, petitioners argue that Donovan was unable to satisfy the "debt" to Donald G. Wildes, thus rendering the $191,000 advance worthless in 1969. Respondent first contends that the advances made by Donald G. Wildes did not create a bona fide debt and a genuine debtor-creditor relationship between Donald G. Wildes and Donovan. Section 166 allows a deduction for any debt which becomes worthless within a taxable year. The character of the deduction can be characterized as either a business or nonbusiness bad debt deduction. In the event that the debt is nonbusiness in character, under section 166(d)(2) the deduction is limited to a short-term capital loss pursuant to section 166(d)(1)(B). Therefore, in deciding this issue we must first examine the advances in order to determine *316 whether they constituted bona fide loans to Donovan which created a debtor-creditor relationship. [13] There have been a myriad of cases which have attempted to set forth a definitive standard to follow in deciding the existence of a bona fide debt. Litton Business Systems, Inc. v. Commissioner,61 T.C. 367 (1973); A.R. Lantz Co. v. United States,424 F.2d 1330 (9th Cir. 1970); Berkowitz v. United States,411 F.2d 818 (5th Cir. 1969); Montclair, Inc. v. Commissioner,318 F.2d 38 (5th Cir. 1963). However, in Fin Hay Realty Co. v. United States,398 F.2d 694 (3d Cir. 1968), the court stated that the ultimate question depends upon the economic reality of the transaction in deciding whether a valid debtor-creditor relationship existed. In addition, the court applied an objective test in analyzing the question of economic reality when it stated: *317 To seek economic reality in objective terms of course disregards the personal interest which a shareholder may have in the welfare of the corporation in which he is a dominant force. But an objective standard is one imposed by the very fact of his dominant position and is much fairer than one which would presumptively construe all such transactions against the shareholder's interest. Under an objective test of economic reality it is useful to compare the form which a similar transaction would have taken had it been between the corporation and an outside lender, and if the shareholder's advance is far more speculative than what an outsider would make, it is obviously a loan in name only. [398 F.2d at 697.] [Emphasis added.] Therefore, our decision with respect to this issue depends upon the economic substance of the transactions between Donald G. Wildes and Donovan and not upon the form of the advances. Gregory v. Helvering,293 U.S. 465 (1935); See Curry v. United States,396 F.2d 630 (5th Cir. 1968), cert. denied 393 U.S. 967 (1968). Having considered the evidence presented we find that based upon the entire *318 record petitioners have failed to adequately establish the existence of a bona fide debt between Donald G. Wildes and Donovan. While the formal criteria of an obligation were met, i.e., the execution of a note payable within one year from the date of execution, the totality of the circumstances surrounding the advances made by Donald G. Wildes in 1969 indicate contributions to capital rather than the creation of a bona fide debt. Initially Donovan was formed with capital constributions from Marie Wildes in the amount of approximately $100,000 worth of securities and $100,000 each from Donald G. Wildes and Patricia McCormick Harrison. The latter contributions were comprised of unsecured notes issued by Argus as previously discussed. Following the formation of Donovan, it purchased oil and gas property leases which cost $902,500. The actual production from these leases bore inadequate income with which to further develop the oil production.The only source of capital to insure the further development and success of the enterprise came from the Wildes family, i.e., the three partners of Donovan of which Donald G. Wildes was the dominant factor in its operations. Outside sources were *319 reluctant to lend money to Donovan due to the risky nature of its operations. Finally, the notes executed by Donovan on behalf of Donald G. Wildes were unsecured. Based on these facts, we find it inconceivable that a prudent businessman would risk his capital in unsecured notes executed by Donovan.See Fin Hay Realty Co.,supra at 698. The only source of repayment petitioners could look to would come from highly speculative future production from the Donovan leases. Accordingly, we find that the $191,000 advanced by Donald G. Wildes to Donovan in 1969 did not constitute a bona fide debt and, therefore, petitioners (Virginia Wildes and the Estate of Donald G. Wildes) have failed in their burden of proof and are not entitled to utilize section 166 with respect to the advances made in 1969. Having so held we need not decide whether such advances were business or nonbusiness bad debts. The next issue for our decision is whether Donovan incurred short-term capital losses in 1969 and 1970 in the respective amounts of $170,224.26 and $50,000, thereby enabling petitioners to claim their allowable share of partnership losses. Again, this issue presents the application *320 of section 166 inasmuch as petitioners contend that advances made by Donovan to Argus during 1969 constituted a debt, the unpaid balance of which became worthless at the close of 1969. In support of their contentions petitioners argue that the advances to Argus were for two distinct purposes: (1) advances to pay operating expenses of partnership property; and (2) general loans to prevent Argus from going into receivership. Petitioners further argue that due to the financial instability of Argus the advances became worthless in 1969. After examining the evidence in its entirety we find that petitioners have failed to establish the first criteria required for the application of section 166, i.e., the existence of a bona fide debt. There is nothing in the record to indicate the execution of promissory notes which in turn would reflect an obligation on the part of Argus to pay a certain sum of money to Donovan at a definite time. The only evidence presented comes in the form of a document which indicates advances made by Donovan to Argus both in 1969 and 1970. However, there is nothing in the document or the accompanying testimony which would establish the existence of a valid. At *321 best, the record reflects numerous advances which were used both to satisfy obligations of Donovan and Argus. Accordingly, we find that petitioners have failed in their burden of proof with respect to the advances made during 1969.Consequently, petitioners are not entitled to deduct their respective share of partnership losses, as they relate to this issue, for the reason that the advances to Argus did not constitute a debt owing to Donovan. Likewise, we find petitioners have failed to establish that the "debt" created by Donovan's advance of $50,000 to John Hill became worthless in 1970. The question of when a debt becomes worthless must be resolved by applying an objective analysis of all relevant facts and circumstances. Sec. 1.166-2(a), Income Tax Regs.Boehm v. Commissioner,326 U.S. 287 (1945). A debt is ordinarily thought to become worthless in the year in which identifiable events clearly mark the futility of any hope of further recovery. James A. Messer Co. v. Commissioner,57 T.C. 848, 860 (1972). In the instant case petitioners argue that Mr. Hill agreed to repay $50,000 to Donovan when a certain corporation exercised its option to *322 purchase stock from Mr. Hill. Mr. Hill agreed to use the proceeds from such sale to pay Donovan. However, the option agreement between Mr. Hill and the corporation came into question which gave rise to litigation. The litigation was ultimately settled between Mr. Hill and the purchasing corporation. Petitioners contend that once the litigation between Mr. Hill and the corporation was settled their agreement was extinguished and because this agreement was the cornerstone for repayment to Donovan the debt was rendered worthless in 1970. We cannot view this sequence of events as rendering Donovan's expectations of repayment futile. To the contrary, the record indicates that in 1970 and 1972 the purchasing corporation bought stock, which was included in this previous option agreement, from Mr. Hill. Clearly, this demonstrates not only that Mr. Hill was the owner of property which could have satisfied Donovan's claim but also that Mr. Hill was in possession of funds which could more readily have satisfied Donovan's claim. For reasons known only to Donovan it chose not to pursue appropriate legal avenues which could have satisfied its claim against Mr. Hill. Finally, Petitioner *323 Harrison contends that she is entitled to deduct the legal expenses she incurred in 1971 which related to the suit for the enforcement of the promissory note executed by John Hill. Pursuant to the law suit, the trial court awarded $35,000 (the face amount of the promissory note) plus attorney fees in the amount of $3,628.45. Petitioner Harrison received the award from Mr. Hill in the form of stock which Mr. Hill owned. The attorney fees were subsequently paid in cash by petitioners in the amount of $3,628.45. Petitioner Harrison relies upon section 212 as the basis of her contention while respondent's sole argument on brief, as it was in his statutory notice of deficiency, is that she is not entitled to deduct the legal expenses because she was reimbursed by John Hill in the form of stock and thus was "not out any attorney fees." The key consideration presented by the facts of this case as established by the statutory notice of deficiency is not the source of the funds but rather the actual payment of funds by Petitioner Harrison to an attorney pursuant to the lawsuit against John Hill. Respondent has conceded that Petitioner Harrison paid for the attorney fees by expending $3,628.45 *324 in 1971.Consequently, we find that Petitioner Harrison is entitled to deduct these attorney fees. Te next issue for our decision is whether certain advances made by petitioners to various individuals became worthless in the taxable year 1969 and thus entitle petitioners to the benefit conferred by section 166, i.e., bad debt deduction. In order to qualify for a bad debt deduction under section 166 it is necessary for petitioner to prove the existence of a debt and that the debt became worthless by the end of such taxable year. Dustin v. Commissioner,53 T.C. 491 (1969), affd. 467 F.2d 47 (9th Cir. 1972); James A. Messer Co. v. Commissioner,57 T.C. 848 (1972). Initially, respondent argues that none of the advances made by Petitioner Wildes and Petitioner Harrison constitute valid debts. Secondly, respondent contends that, presuming the advances made were valid loans, petitioners have failed in their burden of proof with respect to the question of worthlessness in 1969. We agree with respondent to the extent that Petitioners Wildes have failed to establish that the advances made to Mr. Sam Harper and Mr. Oscar Hood became worthless *325 in the taxable year 1969. There is nothing in the record before us which would indicate whether there was a reasonable expectation of repayment from Sam Harper at the close of 1969. The fact that a judgment against Mr. Harper was obtained by Petitioners Wildes in 1972 in no way lends support to its contention of worthlessness in 1969. To the contrary it supports the argument for worthlessness in a later year. With respect to Oscar Hood, Petitioners Wildes obtained a judgment on a note against Mr. Hood in 1961. Following the judgment Petitioner Wildes contacted Mrs. Hood periodically until 1969 when she and Mr. Hood separated and contact with Mrs. Hood ceased due to her unknown whereabouts.Petitioners' contention that their inability to locate Mr. Hood in 1969 constitutes sufficient reason to find in their favor on the question of worthlessness. We do not agree. There is nothing in the record which would indicate Mr. Hood's solvency during the period from 1961 to 1969. While Petitioners Wildes remained in contact with Mr. Hood no attempt was made to enforce their rights against him. Consequently, the worthlessness, if any, of the judgment against Mr. Hood could have occurred *326 at any time from 1961 to 1969. Due to the lack of evidence before us we are unable to make that determination. Petitioners Wildes have sustained their burden of proof with respect to the worthlessness of the debt owing from Mr. J. T. Cook. While the judgment they obtained against Mr. Cook in 1972 does not prove the year of worthlessness it does establish the existence of a debt. As to the question of worthlessness Petitioners Wildes presented credible evidence which demonstrated that Mr. Cook was without assets and at the close of the taxable year 1969 there was no reasonable expectation of repayment. Accordingly, we find that Petitioners Wildes are entitled to utilize section 166 with respect to the worthlessness of the debt owing to them from Mr. Cook. Petitioner Harrison contends that she is entitled to a bad debt deduction in 1971 due to her payment as guarantor on a note which became due in 1971. Respondent in his statutory notice of deficiency determined that the debt, upon which Petitioner Harrison made payment, did not become worthless in the year claimed by her. Consequently, our consideration in the instant case is limited to the question of worthlessness of a *327 debt in the taxable year 1971. [14]
In July 1971 Mr. Donald Oliver executed a note with the Republic National Bank of Dallas in return for $12,000. As part of the provisions of the note Petitioner Harrison signed as guarantor. The note became due and the bank sought payment from Mr. Oliver but was unable to obtain payment from Mr. *328 Oliver.As a consequence, the bank sought payment of principal and interest from Petitioner Harrison in her capacity as guarantor, who paid the bank in October 1971. Upon the payment to the bank by Petitioner Harrison, Mr. Oliver's obligation to the bank became on obligation to Petitioner Harrison who at such time stepped into the shoes of the bank. Putnam v. Commissioner, 352 U.S. 82 (1956). The question we must decide is whether Petitioner Harrison, having paid the bank in her capacity as guarantor, could reasonably anticipate repayment from Mr. Oliver. Watson v. Commissioner, 8 T.C. 569 (1947). We are convinced that Mr. Oliver was hopelessly insolvent at the time Petitioner Harrison paid the bank in satisfaction of Mr. Oliver's debt. As such it would constitute a futile effort on the part of Petitioner Harrison to institute any legal action against Mr. Oliver, as respondent suggests. Accordingly, we find that Petitioner Harrison's right to recover from Mr. Oliver was worthless in the taxable year 1971 and, therefore, she is entitled to claim a bad debt deduction under section 166. In their respective amended petitions petitioners claim *329 they are entitled to refunds for the taxable years 1970, 1971, 1972, 1973 and 1974 due to the carry forward of losses from 1969 and 1970. Due to our holding on the issues in the instant case, which precludes petitioners from claiming such losses, we need not address ourselves to petitioners' arguments relating to carryforward of losses. Moreover, with respect to Petitioner Harrison's taxable year 1971, carryover of losses from 1971 to her taxable year 1972, i.e., legal expenses and worthlessness of a bad debt, is beyond the jurisdiction of this Court for the reason that respondent has not issued a statutory notice of deficiency for the taxable year 1972. LTV Corp. v. Commissioner, 64 T.C. 589 (1975). In addition, Petitioner Virginia Wildes is not entitled to use the income averaging method under section 1301 for her taxable year 1971 due to our holding on the issue in the instant case. Decisions will be entered for the respondent in docket No. 7612-76.
Decision will be entered under Rule 155 in docket Nos. 7613-76 and 7657-76. Footnotes
1. Cases of the following petitioners are consolidated: Patricia McCormick Harrison (Formerly Patricia W. McCormick), docket No. 7613-76; and Estate of Donald G. Wildes, Deceased, Virginia H. Wildes, Co-Executrix, and Patricia W. Harrison, Co-Executrix, and Virginia H. Wildes, docket No. 7657-76.↩
2. Petitioner Harrison filed an amended return for the taxable year 1973 after respondent issued his statutory notice of deficiency for such year. In her petition, Petitioner Harrison asserts that she is entitled to carryover losses from the taxable years 1969 and 1970 to 1973. In addition, Petitioner Harrison alleges in her petition that she is entitled to a refund for her taxable year 1973 due to an overpayment. Therefore, our decision with respect to the taxable year 1973 will depend upon issues pertaining to matters which relate to the carryover losses to 1973.↩
3. All section references are to the Internal Revenue Code of 1954, as amended.↩
*. Donovan Investment Company (herein Donovan) is a partnership and the notes it held (4) constituted capital contributions by Donald Wildes and Petitioner Harrison. The above promissory notes expired in 1966 at which time neither interest nor principal had been paid to petitioners. It was not until 1970 that petitioners caused Argus to execute additional notes in the amount of $600,000.↩
4. The record before us is unclear as to the origin of the trust whose beneficiaries were Donald Wildes and Patricia Harrison.↩
5. GEC had placed $75,000 in escrow pending the negotiations with Argus. Upon termination of negotiations GEC forfeited the $75,000 which Argus then used to construct a water disposal plant in New Mexico in an effort to comply with requirements established by the Conservation Commission of New Mexico and thereby continue production from existing wells in New Mexico.↩
6. The four promissory notes contributed to Donovan by Donald Wildes and Patricia Harrison were part of the original $600,000 note dated July 11, 1963, payable to William Wildes from Argus.↩
7. There is nothing in the record which would indicate whether these advances were secured by adequate collateral.↩
8. Donald Wildes evidently owed $13,500 to Donovan at the time the bad debt deduction was claimed. The amount of $177,500 reflects a reduction of the bad debt claimed by the amount owed to Donovan. There is nothing in the record before us to further describe this debt of Donald Wildes.↩
9. Prior to the execution of this note Petitioner Harrison lent $50,000 to Mr. Hill who repaid $15,000, thus leaving a balance of $35,000.↩
10. Petitioners concede that the ratio of distributive shares of the partners in Donovan in 1969 was as follows: Donald Wildes or Estate of Donald Wildes--32.9 percent; and Patricia McCormick Harrison--67.1 percent.↩
11. Petitioners concede that if this amount is deductible on part of their distributive share of Donovan losses the deduction is properly taken in the taxable year 1970 rather than 1969 as reflected on their respective amended returns for 1969.↩
12. Mr. Oliver executed a promissory note on behalf of the Republic National Bank of Dallas on July 30, 1971, with a due date 60 days following date of execution.↩
13. Sec. 1.166-1(c), Income Tax Regs.↩, provides: "Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166."
14. For the first time on brief respondent argues that no bona fide loan existed at the time the advance was made to Mr. Oliver. His argument is beyond the scope of the statotory notice of deficiency and places Petitioner Harrison in an unfair position in that the proof necessary to sustain the question of worthlessness does not necessarily establish the existence of a bona fide loan. See Commissioner v. Transport Mfg. & Equipment Co.,478 F.2d 731 (8th Cir. 1973), affg. sub nom. Riss v. Commissioner,56 T.C. 388 (1971), and Riss v. Commissioner, 57 T.C. 469↩ (1971). Likewise we will not address ourselves to the argument respondent has lodged regarding the application of section 166(f) for the reason that such argument deals with the question of that which is beyond the question of worthlessness.